So Ordered.

Dated: August 11, 2023



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

In re:

Scott W. Charmoli and      Case No. 22-24358
Lynne M. Charmoli,      Chapter 11

     Debtors.

---

Jackson Family Dentistry, LLC, and
Scott W. Charmoli,

     Plaintiffs,

     v.      Adv. Proc. No. 22-02136

Major Dental Partners, LLC,
Pako Major, and
Jackson Family Dental, LLC,

     Defendants.

---

**OPINION AND ORDER DENYING DEFENDANTS' MOTIONS
TO ABSTAIN AND REMAND, TO STAY RELATED PROCEEDING,
AND FOR RELIEF FROM STAY**

---

A party to a civil case pending in state court may remove to federal district court claims of which the district court has jurisdiction due to the pendency of a case under the Bankruptcy Code. 28 U.S.C. §1452(a). Scott Charmoli, one of the debtors in the underlying bankruptcy case, invoked this authority to remove to this court the claims and counterclaims asserted in a case pending in the circuit court for Washington County, Wisconsin. ECF No. 1.[1] The defendants filed a motion asking this court to remand the removed claims and counterclaims of which, they assert, this court lacks jurisdiction and to abstain from hearing (and remand) the rest, asserting that abstention is required or, if not required, at least permitted and appropriate under the circumstances. See 28 U.S.C. §§1334(c) & 1452(b). Two of the defendants also filed a motion in the underlying bankruptcy case seeking relief from the automatic stay to continue the state-court litigation once it is remanded and a stay of a related proceeding they commenced in this court—for a determination that Charmoli's debts to them are not dischargeable—until that litigation concludes. Case No. 22-24358, ECF No. 107.[2] For the following reasons, the defendants' motions are denied.

I

The state-court case started in October 2019, when Scott Charmoli and Jackson Family Dentistry, LLC, sued Major Dental Partners, LLC, and its principal, Dr. Pako Major, in Washington County for breach of a promissory note and to enforce a related security agreement, among other claims. ECF No. 1-1, at 5–14. Major Dental Partners and Dr. Major counterclaimed, alleging breach of a related asset purchase agreement and fraud, in various forms. *Id.* at 104–115. The plaintiffs later amended their complaint

---

1. Unless otherwise indicated, all citations to docket numbers are to the record in *Jackson Family Dentistry, LLC v. Major Dental Partners, LLC*, Adv. Proc. No. 22-02136.

2. These two defendants, Major Dental Partners, LLC, and Dr. Pako Major, also moved to enlarge the time to file proofs of claim in the underlying case, but the court denied that request in an earlier order. Case No. 22-24358, ECF Nos. 107 & 131. They then timely filed proofs of claim. *Id.*, Claim Nos. 126 & 127.

to add another defendant: Jackson Family *Dental*, LLC, apparently an entity through which Major Dental Partners and Dr. Major operate a dental practice. *Id.* at 144–54.[3]

Based on the pleadings, the relevant agreements and other documents, and the record in the underlying bankruptcy case, the following seems not to be in dispute: Charmoli was a licensed dentist and is the sole member of Jackson Family Dentistry, which owned a dental practice in Jackson, Wisconsin, until January 2019, when it sold virtually all of the "assets used in the operation of the Practice" to Major Dental Partners, pursuant to an asset purchase agreement, for $1,250,000 in cash and a promissory note for $1,050,000, to be paid over ten years, with interest, in equal monthly amounts, starting in February 2019. See *id.* at 155–198.[4] To secure payment on the note, Major Dental Partners gave Jackson Family Dentistry a security interest in

---

3.      Pleading in the state-court action was not in the ordinary course. The defendants did not timely answer the amended complaint, so the plaintiffs moved for entry of a default judgment. See ECF No. 1-1, at 228–30. In response, the defendants filed a motion for more time to file an answer, as well as a proposed answer. See *id.* at 231–54. After briefing, the state court denied the plaintiffs' motion and granted the defendants' motion, "receiv[ing] and acknowledg[ing] the proposed Answer to the Amended Complaint as valid." See *id.* at 570–74. Accordingly, this opinion treats the proposed answer, filed with the defendants' motion, as their answer to the amended complaint.

4.      The amended complaint alleges, and the defendants' answer admits, that Charmoli and Jackson Family Dentistry "owned and operated [the] dental practice". ECF No. 1-1, at 145, ¶¶1–3; *id.* at 245, ¶¶1–3. But the asset purchase agreement, "made and entered into . . . by and among Seller and Buyer" (respectively defined as Jackson Family Dentistry and Major Dental Partners), provides for the sale of certain assets by "Seller" to "Buyer", and excludes from the sale "[a]ll personal items of Owner" (defined as Charmoli). *Id.* at 155, 175 & 177–78. It seems, therefore, that Charmoli did not own the practice—though he may have "operated" it—and he was not a party to the asset purchase agreement, despite signing it both individually, as "Owner", and for Jackson Family Dentistry, as its sole member. *Id.* at 173. The parties ignore this distinction, however, so this opinion does not address it, other than to note above, for present purposes only, that the practice was owned by Jackson Family Dentistry. The debtors' schedule of assets in the underlying bankruptcy case lists 100% ownership of Jackson Family Dentistry, attesting that Charmoli remains its sole member. Case No. 22-24358, ECF No. 1, at 64. Public records of the Wisconsin Department of Safety and Professional Services, available on its website at https://licensesearch.wi.gov/, indicate that Charmoli is no longer licensed to practice dentistry, consistent with the debtors' schedule A/B, which states that they hold no "professional licenses". *Id.* at 65. The amended complaint alleges, and the defendants' answer admits, that a true and correct copy of the asset purchase agreement is attached to it as exhibit A and that a true and correct copy of the promissory note is attached to it as exhibit B. ECF No. 1-1, at 146, ¶¶10 & 13; *id.* at 246, ¶¶10 & 13.

certain "assets related to the . . . business". See *id.* at 203–09.[5] Dr. Major, the sole member of Major Dental Partners, guaranteed its obligations under the asset purchase agreement, the promissory note, and the security agreement. See *id.* at 199–202.[6] Finally, Charmoli signed an employment agreement with Jackson Family *Dental*, to continue working for the practice as an "associate dentist". See *id.* at 211–25.[7]

The parties agree on little else. The plaintiffs allege (and the defendants deny) that (1) Major Dental Partners defaulted on its payment obligations under the note,

---

5.      The amended complaint alleges, and the defendants' answer admits, that a true and correct copy of the security agreement is attached to it as exhibit D. ECF No. 1-1 at 146, ¶17; *id.* at 246, ¶17. The court notes, however, that the defendants' answer to the amended complaint nevertheless denies—asserting a lack of knowledge or information sufficient to form a belief about its truth—the amended complaint's preceding allegation: that "the Note was secured by Major Dental Partners agreeing to pledge as collateral all of the Practice assets being conveyed or subsequently owned and utilized with respect to the Practice, including its accounts receivable." *Id.* at 146, ¶16; *id.* at 246, ¶16.

6.      The guaranty states that "Major Dental Partners . . . is wholly owned by Guarantor" (defined as Dr. Major), and Dr. Major signed an assignment and assumption agreement, filed as an exhibit to the asset purchase agreement, for Major Dental Partners, as its sole member. ECF No. 1-1, at 199; see *id.* at 180–82. The amended complaint alleges, and the defendants' answer admits, that a true and correct copy of the guaranty is attached to it as exhibit C. *Id.* at 146, ¶15; *id.* at 246, ¶15. The court notes, however, that the defendants' answer to the amended complaint nevertheless denies—again asserting a lack of knowledge or information sufficient to form a belief about its truth—the amended complaint's preceding allegation: that "[t]he Note was separately and unconditionally personally guaranteed by . . . [Dr.] Major." *Id.* at 146, ¶14; *id.* at 246, ¶14.

7.      The amended complaint alleges, and the defendants' answer admits, that the asset purchase agreement "required that . . . Charmoli separately enter into an employment [agreement] with *Major Dental Partners*," such that he "would continue to practice dentistry at the Practice as an employee of *the Defendants*". ECF No. 1-1, at 147, ¶¶18–19 (emphasis added); see also *id.* at 246–47, ¶¶18–19. The asset purchase agreement does not quite say that, however. It requires "Seller" (Jackson Family *Dentistry*) to deliver to "Buyer" (Major Dental Partners), at the closing, "[a] copy of the Employment Agreement executed by Owner" (Charmoli); separately requires "Buyer" to deliver to "Seller", again at the closing, "[a] copy of the Employment Agreement executed by Buyer"; and defines "Employment Agreement" as "that certain Employment Agreement to be entered into by and between Owner and Buyer in conjunction with the closing of the transactions contemplated in this Agreement." *Id.* at 157 & 177. But the employment agreement is *not* between "Owner" (Charmoli) and "Buyer" (Major Dental Partners)—it is "between the Practice" (Jackson Family *Dental*) "and the Dentist" (Charmoli). *Id.* at 211 & 221-22. The amended complaint alleges, and the defendants' answer admits, that a true and correct copy of "Charmoli's employment agreement with Jackson Family Dental" is attached to it as exhibit E. *Id.* at 147, ¶19; *id.* at 247, ¶19. The parties ignore this conflation (or confusion) of entities, so this opinion does as well. More careful attention to such matters may be necessary in the future, since the adjudication of the parties' competing claims, particularly for breach of contract, may depend in part on the proper identification of the parties to the specific contracts at issue.

entitling Jackson Family Dentistry to a judgment in the full amount due, a pre-payment penalty, and interest at the default rate under the note from both Major Dental Partners and Dr. Major, based on his guaranty, and to proceed against the collateral identified in the security agreement; (2) Jackson Family Dental breached the employment agreement with Charmoli, and the implied duty of good faith and fair dealing, by directly and indirectly denying him compensation he is owed under its terms, which entitles him to damages and a statutory penalty; and (3) Major Dental Partners or Jackson Family Dental, or both, violated Wisconsin law by using Charmoli's image and likeness to promote the practice, without his consent, after his employment ended, entitling him to an injunction and damages. The plaintiffs also seek to recover their costs and attorneys' fees for bringing these claims.

Major Dental Partners and Dr. Major tell a different story.[8] They allege (and the plaintiffs, in turn, deny) that Charmoli "intentionally engaged in a repeated practice of causing damage to patients' healthy or previously repaired teeth in order to create a need for unnecessary dental crown procedures", "recommending and performing unnecessary dental procedures", and "billing insurance companies and patients for unnecessary work performed", in violation of "several applicable laws, including those laws and regulations related to the practice of dentistry" and contrary to various

---

8. Jackson Family Dental was not yet a party to the state-court case when Major Dental Partners and Dr. Major filed their counterclaims, and it has never asserted counterclaims, even after the plaintiffs amended the complaint to add it as a defendant. Moreover, while Major Dental Partners and Dr. Major filed proofs of claim in the underlying bankruptcy case and brought an adversary proceeding against Charmoli for a determination of dischargeability with respect to his alleged debts to them, Jackson Family Dental has not taken any such steps, suggesting that it is not asserting any claims against Charmoli (or Jackson Family Dentistry) and that it does not intend to do so. Notably, neither Major Dental Partners nor Dr. Major is a party to the employment agreement attached to the amended complaint, which the parties agree is authentic: only Charmoli and Jackson Family Dental are. See ECF No. 1-1, at 211 & 222; see also id. at 147, ¶19; id. at 247, ¶19. And it appears that neither Major Dental Partners nor Dr. Major is asserting a claim in the underlying bankruptcy case or seeking a determination of dischargeability in their adversary proceeding with respect to any debt allegedly arising from the employment agreement or a breach of its terms. See Case No. 22-24358, Claim No. 126-1, at 8; id., Claim No. 127-1, at 8; *Major Dental Partners, LLC v. Charmoli*, Adv. Proc. No. 23-02001, ECF No. 1, at 7–12.

representations that Charmoli made during "negotiations . . . for the sale of the practice", on which they reasonably relied, as well as express warranties in the asset purchase agreement. See *id.* at 106–109, ¶¶11–32; *id.* at 117–18, ¶¶11–32. They seek damages for breach of the asset purchase agreement and the duty of good faith and fair dealing; rescission of the promissory note, guaranty, and employment agreement for intentional misrepresentation and fraud in the inducement; attorneys' fees and costs; and punitive damages under Wisconsin Statutes section 895.446 for theft by fraud, namely violations of Wisconsin Statutes sections 943.20 and 943.395.[9] They tell the same story in the underlying case (in their proofs of claim and associated filings) and in their adversary proceeding for a determination that Charmoli owes them non-dischargeable debts.[10]

---

9. As noted above, neither Major Dental Partners nor Dr. Major is a party to the employment agreement between Charmoli and Jackson Family Dental, so it is not clear whether (or how) they can seek its rescission. See *supra* note 8. That issue, however, is beyond the scope of this opinion.

10. With their proofs of claim in the underlying bankruptcy case, Major Dental Partners and Dr. Major each filed the same addendum setting forth substantially similar allegations about Charmoli's conduct before and during the parties' negotiations for the sale of the dental practice, itemizing their estimated damages (nearly $12 million for loss of future business, overstated purchase value of the business, fraud-reporting costs, punitive damages, etc.), and summarizing recent criminal proceedings against Charmoli in federal district court, where he was charged with and convicted on several counts of health care fraud in violation of 18 U.S.C. §1347 and false statements related to health care matters in violation of 18 U.S.C. §1035(a)(1) & (2). See Case No. 22-24358, Claim No. 126-1, at 4–10; *id.*, Claim No. 127-1, at 4–10; see also *United States v. Charmoli*, No. 20-CR-242, ECF No. 123, at 1 (E.D. Wis. Sept. 22, 2022). In their adversary proceeding, Major Dental Partners and Dr. Major seek a determination that Charmoli owes them debts that cannot be discharged in the underlying bankruptcy case because they were "obtained by . . . false pretenses, false representations, or actual fraud" or by his use of materially false written statements about Jackson Family Dentistry's financial condition, or both, and because they are for willful and malicious injury to Major Dental Partners and Dr. Major or their property. See 11 U.S.C. §523(a)(2)(A), (a)(2)(B) & (a)(6); Adv. Proc. No. 23-02001, ECF No. 1. Their claims in that adversary proceeding, like their claims in the underlying bankruptcy case, are based on the same allegations that undergird their removed counterclaims—broadly, that Charmoli defrauded them during the parties' negotiations for the sale of the dental practice—as well as his criminal conviction. See Adv. Proc. No. 23-02001, ECF No. 1. Many of these claims seem to be based in part on a conflation of Charmoli with Jackson Family Dentistry. See *id.* at 9 (expressly defining "Charmoli", collectively, as both "Debtor and Jackson Family Dentistry"). For example: Major Dental Partners and Dr. Major allege in their adversary complaint that, when "[t]he deal closed on January 4, 2019," they paid Charmoli $1,250,000 in

II

As mentioned above, and subject to certain exceptions that do not apply here, "[a] party may remove any claim . . . in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim . . . under [28 U.S.C. §]1334". §1452(a). Section 1334 vests the district courts with "exclusive jurisdiction of all cases under title 11", i.e., the Bankruptcy Code, and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."[11] §1334(a) & (b). These broad grants of

---

cash and executed a promissory note for the remaining $1,050,000, giving rise to a debt that is not dischargeable in the underlying case. *Id.* at 3 & 8, ¶¶14 & 44–46. But the asset purchase agreement attached to the plaintiffs' state-court amended complaint, which the parties agree is authentic, required Major Dental Partners (alone) to pay the cash due at closing and deliver a promissory note to Jackson Family Dentistry (not Charmoli), and the promissory note attached to the plaintiffs' state-court amended complaint, which the parties agree is also authentic, is from Major Dental Partners (alone) to Jackson Family Dentistry (not Charmoli). See ECF No. 1-1, at 156 & 191; see also *id.* at 146, ¶¶10 & 13; *id.* at 246, ¶¶10 & 13. The answer filed by Major Dental Partners and Dr. Major in the state-court action not only admits the alleged payment requirements but "puts forth" that Major Dental Partners did what it was required to do. See *id.* at 146, ¶12 (alleging that, "[a]t the closing, Major Dental Partners was to pay Jackson Family Dentistry $1,250,000.00 in cash, with the balance of the purchase price paid pursuant to a promissory note executed by Major Dental Partners in favor of Jackson Family Dentistry for the sum of $1,050,000.00."); *id.* at 246, ¶12 (admitting this allegation and adding that "Major Dental Partners did indeed pay Jackson Family Dentistry, LLC $1,250,000 in cash with the balance of the purchase price paid pursuant to a promissory note executed by Major Dental Partners in favor of Jackson Family Dentistry for the sum of $1,050,000"). Charmoli may have been paid pursuant to the employment agreement he signed with Jackson Family Dental (which, again, is an apparently distinct entity), to continue working for the practice after the sale, but neither Major Dental Partners nor Dr. Major is a party to that agreement. See *supra* notes 7 & 8. It seems, therefore, that whether "Jackson Family Dentistry is wholly owned by [Charmoli]", and whether Charmoli executed the asset purchase agreement individually—as Major Dental Partners and Dr. Major's adversary complaint alleges, and Charmoli's answer to that complaint admits—Jackson Family Dentistry was paid (and promised payment) pursuant to the asset purchase agreement and promissory note, but Charmoli was not. See Adv. Proc. No. 23-02001, ECF No. 1, at 10 & 11, ¶¶51 & 53. This may not ultimately matter, and the parties do not clearly acknowledge any such potential issues in connection with the disputes addressed here, so this opinion does not belabor them further. But, again, the parties should endeavor in future filings to be more precise in describing the relationships between the various entities, including Charmoli and Dr. Major, and the alleged liabilities of these apparently legally distinct parties. See *supra* note 7.

11.       That this paragraph refers to the jurisdiction of the *district* court, even though this proceeding is pending before the *bankruptcy* court, is both deliberate and important. District courts and bankruptcy courts are often, if implicitly, discussed as though they are separate, but each district's

jurisdiction encompass all of the parties' removed claims and counterclaims, so all of them were properly removed under §1452(a). See *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) (citing H.R. Rep. No. 95-595, at 43–48 (1977)) (describing "[t]he jurisdictional grant in § 1334(b)" as "comprehensive").[12] But two remaining questions must be answered to decide the

---

bankruptcy court is "a unit of the district court" consisting of its "bankruptcy judges in regular active service". 28 U.S.C. §151; see also *Roete v. Smith (In re Roete)*, 936 F.2d 963, 967 (7th Cir. 1991) (noting that §151 "define[s] bankruptcy judges as a 'unit of the District Court.'"). A district court can refer bankruptcy cases and proceedings to its bankruptcy court—i.e., "to the bankruptcy judges for the district"—under 28 U.S.C. §157(a), much like a district court judge can refer pretrial and other matters to a magistrate judge under 28 U.S.C. §636(b). That is what happened here: this opinion's opening paragraph states that Charmoli removed the parties' claims and counterclaims to "this court", i.e., the bankruptcy court, but it is more accurate to say that he removed them to the district court, which referred them to the bankruptcy court by general order, pursuant to §157(a). Order of Reference (E.D. Wis. July 16, 1984) ("[A]ll proceedings . . . arising in or related to a case under title 11 shall be referred to the bankruptcy judges of this District."), https://www.wied.uscourts.gov/general-orders/order-reference; see also Fed. R. Bankr. P. 9027(e)(1) ("After removal of a claim or cause of action to a district court the district court or, if the case under the Code has been referred to a bankruptcy judge of the district, the bankruptcy judge, may issue all necessary orders and process to bring before it all proper parties . . . ."). The district court's reference of this proceeding to the bankruptcy court is not without its complications: bankruptcy judges, like magistrate judges, are not Article III judges and therefore subject to statutory and constitutional limitations on their adjudicatory authority with respect to certain claims, including state-law claims like some of those at issue here. See *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 668–69 (2015); see also §§157(b)–(c) & 636(b)–(c); *Stern v. Marshall*, 564 U.S. 462, 473–503 (2011) (holding that a bankruptcy judge's final adjudication of a state-law counterclaim by a bankruptcy estate against a creditor was authorized by statute but not by Article III of the Constitution); *Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 465–66 (7th Cir. 2017) (first quoting §636(c)(1); and then quoting *Kalan v. City of St. Francis*, 274 F.3d 1150, 1152 (7th Cir. 2001)) (Section 636(c)(1) permits final adjudication by a magistrate judge only with "the consent of the parties", which is "essential to upholding § 636(c)'s constitutionality against arguments that it improperly vests the judicial power of the United States in non-Article III judges."). Importantly, the primary issues here are whether the *district* court has jurisdiction of the parties' removed claims and counterclaims under §1334 and, if it does, whether abstention is either required under §1334(c)(2) or warranted under §1334(c)(1) or §1452(b) with respect to some or all of them. See *Diamond Mortg. Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1238 (7th Cir. 1990) ("[O]riginal jurisdiction over 'all civil proceedings arising under title 11, or arising in or related to cases under title 11,' . . . rest[s] with the district court."). The extent to which the *bankruptcy* court is constitutionally authorized to adjudicate the removed claims and counterclaims through entry of a final judgment is beyond the scope of this opinion.

12.     The defendants contend that the removed claims by and counterclaims against Jackson Family Dentistry were improperly removed and must be remanded because jurisdiction of them under §1334 is lacking. ECF No. 9, at 4–5. If a claim is removed to a district court under §1452(a), but the district

defendants' motion to abstain and remand: First, does §1334(c)(2) *require* abstention with respect to any of the removed claims and counterclaims? Second, if not, is abstention *warranted* under §1334(c)(1) or §1452(b), or both, with respect to some or all of them? For the following reasons, the answer to both questions is no.

---

court lacks jurisdiction of it under §1334, then the claim must be remanded, not only because the district court cannot hear it, but because the removing party failed to comply with the requirements of the removal statute. See 28 U.S.C. §1447(c); *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 230–32 (2007); *Ayotte v. Boeing Co.*, 316 F. Supp. 3d 1066, 1072 (N.D. Ill. 2018) (citing *GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 625–26 (7th Cir. 2013)) ("A case must be remanded to state court if subject-matter jurisdiction is lacking or if the [removing party] failed to comply with the removal statute."). But the resolution of the removed claims by and counterclaims against Jackson Family Dentistry, as best one can determine at this early stage of the litigation, "ha[ve] a potential effect on other creditors" of the Charmolis, and they are, therefore, at the very least, "related to" the underlying bankruptcy case. *Bush v. United States*, 939 F.3d 839, 846 (7th Cir. 2019) ("[T]he related-to jurisdiction must be assessed at the outset of the dispute, and it is satisfied when the resolution has a potential effect on other creditors."). As a result, the district court has jurisdiction of them under §1334. The Charmolis contemplate that any net recovery by Jackson Family Dentistry in this litigation will go to the estate for distribution to their creditors, i.e., that a victory, on balance, by Jackson Family Dentistry will add to the estate's distributable funds, thereby increasing the amount the estate can pay the creditors. See Case No. 22-24358, ECF No. 110, at 3 ("To . . . enhance the pool of assets available to pay creditors, the Debtors have removed from Washington County Circuit Court the state court proceeding against [Major Dental Partners], [Dr.] Major, and Jackson Family Dental, LLC."). The defendants note that Jackson Family Dentistry may have debts that it would have to satisfy from any net recovery in this litigation before it could give any remaining funds to the estate for distribution to the Charmolis' creditors, namely that it may be liable on "claims against [Charmoli] for damaging patients' teeth while he owned and operated Jackson Family Dentistry". ECF No. 25, at 6. Assuming any such claims exist (and are prosecuted), however, creditors other than the defendants would still be affected if Jackson Family Dentistry prevails in this litigation: Jackson Family Dentistry and Charmoli would likely be jointly and severally liable on any such claims, so if Jackson Family Dentistry uses any net recovery in this litigation to pay those claims directly, the claims of some creditors in the underlying bankruptcy case may be reduced and, as a result, the share of the estate's distributable assets to which the Charmolis' *other* creditors are entitled may increase. Moreover, for the reasons stated in the prior order for supplemental briefing, resolving the removed counterclaims against Jackson Family Dentistry "would all-but resolve the proceedings in this court with respect to allowance or disallowance of [Major Dental Partners's and Dr. Major's] claims in the underlying bankruptcy case", which are based on the same allegations, see ECF No. 23, at 13–14, and that would directly impact how much other creditors are entitled to receive from the bankruptcy estate. This suffices to resolve the subject-matter jurisdiction issue raised by the defendants, though, as discussed in detail below, the removed claims by and counterclaims against Jackson Family Dentistry are not correctly characterized as merely "related to" the underlying bankruptcy case for purposes of §1334. See *Stern*, 564 U.S. at 477 (distinguishing "'core' bankruptcy proceeding[s]" from proceedings "merely 'related to'" or "only related to [a] bankruptcy case").

A

Section 1334(c)(2) requires a court, in specified circumstances, to "abstain from hearing [a] proceeding" that is both "based upon a State law claim or State law cause of action" and "related to a case under title 11 but not arising under title 11 or arising in a case under title 11".[13] In other words, §1334(c)(2) does *not* require a court to abstain from hearing any proceeding either "arising under" the Bankruptcy Code or "arising in" a bankruptcy case. The defendants concede that, since Major Dental Partners and Dr. Major filed proofs of claim in the underlying bankruptcy case, which "are based on the [removed] counterclaims [they] assert against [Charmoli]", those removed counterclaims are not subject to mandatory abstention under §1334(c)(2). ECF No. 25, at 2. They argue, though, that the rest of the removed claims and counterclaims (i.e., Charmoli's and Jackson Family Dentistry's removed claims and the removed counterclaims against Jackson Family Dentistry) are all subject to mandatory abstention under §1334(c)(2) because they are, at most, "related to" the bankruptcy case. *Id.* at 3–7.

1

Characterizing a bankruptcy proceeding can be difficult. It is often easy enough to identify a proceeding as one "arising under" the Bankruptcy Code because "it presents a substantive question of bankruptcy law." *Bush*, 939 F.3d at 844 (citing *Barnett v. Stern*, 909 F.2d 973, 981 (7th Cir. 1990)). But what distinguishes a proceeding "arising in" a bankruptcy case, which is not subject to §1334(c)(2)'s abstention mandate, from a proceeding merely "related to" a bankruptcy case, which is?

Courts have formulated various ways of delineating the kinds of bankruptcy proceedings that fit into each of these categories. The Seventh Circuit, for example, has

---

13. Section 1334(c)(2), like all other provisions of §1334, refers only to the district court and makes no mention of the bankruptcy court. Still, courts have concluded that a bankruptcy court, which, again, is a unit of its district court, may "rule directly on motions to abstain" when the district court has referred the proceeding to its bankruptcy judges. See *McDevitt & St. Co. v. Hammons/Clark P'ship No. 1 (In re Clark)*, 127 B.R. 351, 353 (W.D.N.C. 1991); see also §151; Fed. R. Bankr. P. 9027(d) & (e).

said that proceedings "arising in" bankruptcy cases include "administrative matters that arise *only* in bankruptcy cases" and thus "would have 'no existence outside of the bankruptcy'". See *Ortiz v. Aurora Health Care, Inc. (In re Ortiz)*, 665 F.3d 906, 911 (7th Cir. 2011) (quoting *Nelson v. Welch (In re Repository Techs., Inc.)*, 601 F.3d 710, 719 (7th Cir. 2010)); *infra* note 23 (discussing the history and application of this construction of "arising in" jurisdiction). And "[t]he usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy . . . .*" *Celotex*, 514 U.S. at 308 n.6 (quoting *Pacor*, 743 F.2d at 994); see also *Bush*, 939 F.3d at 846 (adopting the same rule).

But, as the Supreme Court observed in *Stern v. Marshall*, §157 of title 28 reduces §1334's three categories of bankruptcy proceedings to two: "core" and "non-core" proceedings. See §157(b)(1) & (4); 564 U.S. at 476. "Core proceedings" are those "arising under" the Bankruptcy Code or "arising in" a bankruptcy case, and "non-core proceedings" are those that are merely "related to" a bankruptcy case (i.e., "proceeding[s] that [are] not . . . core proceeding[s] but that [are] otherwise related to . . . case[s] under title 11"). §157(b)(1), (b)(4) & (c)(1); 564 U.S. at 476 (rejecting the argument that "there is a category of core proceedings that neither arise under Title 11 nor arise in a Title 11 case" and concluding that "core proceedings are those that arise in a bankruptcy case or under Title 11").[14]

---

14.     Although neither the Supreme Court nor the Seventh Circuit has expressly held that "proceedings arising under title 11, or arising in a case under title 11", in §157, means the same thing as "proceedings arising under title 11, or arising in . . . cases under title 11", in §1334, and the parties do not explicitly address this issue, the Seventh Circuit has explained the basis for a bankruptcy court's jurisdiction under §1334 in terms of whether a given proceeding was a "core" proceeding under §157(b)(2). See, e.g., *In re Smith*, 848 F.2d 813, 816 (7th Cir. 1988) (describing the bankruptcy court's jurisdiction of confirmation of a plan in a case under chapter 13 as "proper pursuant to . . . § 1334" because "§ 157(b)(2)(L) provides that confirmation of a plan is a 'core proceeding'"); *Price v. Rochford*, 947 F.2d 829, 832 n.1 (7th Cir. 1991) (explaining, by reference to §157(b)(2)(A), that the district court's

Section 157(b)(2) "catalog[ues] 16 different types of proceedings" that are "core" proceedings and therefore necessarily proceedings either "arising under" the Bankruptcy Code or "arising in" a bankruptcy case. *Stern*, 564 U.S. at 477; see *Barnett*, 909 F.2d at 979 ("The starting point for determining whether an action is a core proceeding is . . . § 157(b)(2), which contains a nonexclusive list of matters that are considered 'core proceedings.'"). Among the "core" proceedings listed in §157(b)(2) are "matters concerning the administration of the estate", "counterclaims by the estate against persons filing claims against the estate", and most "other proceedings affecting the liquidation of the assets of the estate". §157(b)(2)(A), (C) & (O); see *infra* note 22 and accompanying text (discussing §157(b)(2)(A) & (O) as "catch-all provisions").

All of Charmoli's removed claims readily fit within one of the enumerated categories of "core" proceedings in §157(b)(2), and most of them readily fit within a second. Charmoli's removed claims became property of his bankruptcy estate when the Charmolis commenced the underlying bankruptcy case, so litigating them "affect[s] the liquidation of . . . assets of the estate", and they are therefore "core" proceedings under §157(b)(2)(O). See 11 U.S.C. §541(a).[15] Charmoli's removed claims against Major Dental

---

jurisdiction under §1334 "of all civil proceedings under the Bankruptcy Code" extended to "[a] claim for damages under [11 U.S.C.] section 362(h)"). Moreover, "it is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Pereira v. Sessions*, 138 S. Ct. 2105, 2115 (2018) (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 571 (2012)). Here, the relevant language of both §157 and §1334 was enacted as part of the same act: the Bankruptcy Amendments and Federal Judgeship Act of 1984. Pub. L. No. 98-353, §§101(a) & 104(a), 98 Stat. 333, 333 & 336. And the defendants concede that the kinds of proceedings listed as "core" in §157(b)(2) are not subject to mandatory abstention under §1334(c)(2). See ECF No. 25, at 9. Therefore, this opinion assumes that "core" proceedings under §157 are necessarily proceedings either "arising under" the Code or "arising in" a bankruptcy case—i.e., not proceedings merely "related to" a bankruptcy case—that are thus not subject to mandatory abstention under §1334(c)(2).

      15.     Charmoli's removed claims are property of his bankruptcy estate. See 11 U.S.C. §541(a)(1) (subject to certain inapplicable exceptions, commencing a bankruptcy case "creates an estate" that "is comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case" "wherever located and by whomever held"). Those claims cannot be settled or otherwise compromised without approval of the court presiding over the bankruptcy case after notice to interested

Partners and Dr. Major are also "core" proceedings under §157(b)(2)(C) ("counterclaims by the estate against persons filing claims against the estate") because both Major Dental Partners and Dr. Major filed proofs of claim in the underlying bankruptcy case and Charmoli's removed claims against them are now claims of his bankruptcy estate by operation of §541(a) of the Bankruptcy Code.[16] 11 U.S.C. §541(a).

The removed claims and counterclaims by and against Jackson Family Dentistry are "core" proceedings, as well, for essentially three reasons. First, although those claims and counterclaims are *not* property of the bankruptcy estate, the only

---

parties. See 28 U.S.C. §1334(e)(1) ("The district court in which a [bankruptcy] case . . . is commenced or is pending shall have exclusive jurisdiction" "of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate"); 11 U.S.C. §§363(b)(1) (allowing a trustee to "use, sell, or lease" "property of the estate" "other than in the ordinary course of business" only "after notice and a hearing") & 1107(a) (providing that generally the "debtor in possession shall have all the rights, . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a" chapter 11 case, "[s]ubject to any limitations on a trustee serving in a [chapter 11] case"); and Fed. R. Bankr. P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct."). See also *In re RNI Wind Down Corp.*, 348 B.R. 286, 294 (Bankr. D. Del. 2006) (citing 28 U.S.C. § 1334(e)(1), aff'd, 359 Fed. Appx. 352 (3d Cir. 2010) ("the bankruptcy court's subject-matter jurisdiction over property of the estate, including claims for injury to the debtor, is created by statute.").

16. While Charmoli's claims against Major Dental Partners and Dr. Major are not presented as "counterclaims" in the ordinary civil litigation sense, i.e., they are not "claim[s] for relief asserted against an opposing party *after* an original claim has been made", *Black's Law Dictionary* 441 (11th ed. 2019) (emphasis added), they are "counterclaims" as Congress used that term in §157(b)(2)(C). In the bankruptcy context to which §157(b)(2)(C) relates, one must read the use of "counterclaim" more broadly, to mean "an opposing claim". *Webster's Third New International Dictionary* 519 (2002). Congress's inclusion in §157(b)(2)(C) of counterclaims by the bankruptcy estate against persons filing claims against that estate permits a bankruptcy court to adjudicate most claims in a bankruptcy case between the bankruptcy estate and the debtor's creditors, because resolving the claims of both is typically necessary to determining, on the one hand, the extent of the estate's liabilities to the debtor's creditors and, on the other hand, the extent to which those asserting claims against the estate may be liable to the estate (any amounts owed on claims of the estate are property of the estate that may be collected and liquidated for the benefit of the debtor's creditors). See §157(b)(2)(B) (designating as "core" proceedings "allowance and disallowance of claims against the estate"); see also 11 U.S.C. §553(a) (providing that, subject to certain exceptions, the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case").

membership interest in Jackson Family Dentistry, which was held by Charmoli when the bankruptcy case was commenced, *is* property of the bankruptcy estate. See 11 U.S.C. §541(a); *supra* note 4. Second, because Jackson Family Dentistry is dissolved, applicable nonbankruptcy law requires that it be liquidated, which will necessarily result in the liquidation of the sole interest in it for the benefit of the Charmolis' bankruptcy estates and their creditors. See *infra* note 30 and accompanying text. Third, the Charmolis, as debtors in possession, propose to liquidate that interest (and distribute any resulting value to their creditors pursuant to their bankruptcy plan) in part by litigating the removed claims and counterclaims by and against Jackson Family Dentistry. See *supra* note 12. Therefore, those claims and counterclaims are "proceedings affecting the liquidation of [an] asset[] of the estate", which makes them "core" proceedings under §157(b)(2)(O).

Though it perhaps goes without saying, this conclusion—that the removed claims and counterclaims by and against Jackson Family Dentistry are "core" proceedings that are not subject to mandatory abstention under §1334(c)(2)—is a narrow one, necessarily limited to the specific circumstances of this litigation in the context of the underlying bankruptcy case.[17] As courts have observed, and the

---

[17]     Governing precedent makes clear that decisions as to the existence and nature of bankruptcy jurisdiction of a proceeding must be made based on the circumstances presented. For example, in *Zerand-Bernal Group, Inc. v. Cox*, on which the defendants rely, the Seventh Circuit affirmed the dismissal, for lack of jurisdiction, of an adversary proceeding to reopen a bankruptcy case and enjoin a products-liability suit brought in state court against the purchaser of a chapter 11 debtor's assets under an agreement authorized by the bankruptcy court. 23 F.3d 159, 160–61 (7th Cir. 1994). But the Seventh Circuit's decision is expressly based on the relevant facts: the state-court suit at issue was filed "[f]our and a half years" after "[t]he transfer of assets pursuant to the sale agreement [in the chapter 11 case] was completed"; the asserted claim was "neither by nor against the debtor" ("the debtor . . . no longer exist[ed]"); and all of the debtor's assets had already been either transferred to the purchaser under the sale agreement or distributed to its creditors in the bankruptcy case, so the suit could not "possibly affect the amount of property available for distribution to [its] creditors". *Id.* at 161–62. Such circumstances are not at all analogous to those presented here, so it should come as no surprise that the results differ. See also *Celotex*, 514 U.S. at 309–10 (holding that a proceeding that "d[id] not directly involve [the debtor]" was nonetheless "related to" the debtor's bankruptcy case for purposes of §1334(b) based on the nature of the proceeding and its potential effect on the underlying bankruptcy case, among other things).

defendants argue, claims by and against non-debtors are typically not considered to be "core" bankruptcy proceedings. See *Schmidt v. Klein Bank (In re Schmidt)*, 453 B.R. 346, 351 (B.A.P. 8th Cir. 2011) ("[A]bsent extraordinary circumstances, if a principal wishes to use the Bankruptcy Code to protect the assets of its corporation, or wants a bankruptcy court to decide causes of action against the corporation, it needs to file a bankruptcy case on behalf of the corporation."); ECF No. 25, at 6–7. Nothing in this opinion should be understood as running counter to that general rule. But the general rule of general rules is that they have exceptions, and this litigation, in the context of the underlying bankruptcy case, is an exception to the general rule: where the only interest in an LLC is property of a bankruptcy estate and the debtor in possession proposes to liquidate that interest in order to pay the debtor's creditors under a bankruptcy plan, then unliquidated claims by and against the LLC that must be resolved (through litigation or otherwise) to determine the value of the bankruptcy estate's interest in the LLC (if any) and reduce that value to cash for distribution to the debtor's creditors are properly characterized as "core" proceedings under §157(b)(2)(O). And this is especially so where, as here, the LLC is dissolved and applicable nonbankruptcy law therefore requires that its liabilities must be determined and satisfied and any remaining value be reduced to cash and distributed to its member. All of which is to say that, even if claims by and against non-debtors are not "core" proceedings in *all but the rarest* of instances, within the specific context of *this* underlying bankruptcy case and in light of the nonbankruptcy law that applies *here*, the removed claims and counterclaims by and against Jackson Family Dentistry *are* "core" proceedings. As a result, those claims and counterclaims are not subject to mandatory abstention under §1334(c)(2).

2

Fully explicating the conclusions above and understanding the operation of the district court's bankruptcy jurisdiction requires careful consideration of the text of the relevant statutes in light of their history. Specifically, one must consider the 1978

codification of bankruptcy law and its accompanying jurisdictional provisions, the Supreme Court's invalidation of those jurisdictional provisions in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, Congress's 1984 response to *Marathon*, and the Supreme Court's interpretation of the 1984 amendments to title 28 in *Stern v. Marshall*, which effectively countermanded decades of lower-court statutory analysis undertaken in the name of constitutional avoidance.

Since Congress granted the district courts tripartite jurisdiction of bankruptcy proceedings, courts have struggled to make sense of its chosen terminology: what is a proceeding "arising under" the Bankruptcy Code, "arising in" a bankruptcy case, or "related to" a bankruptcy case under section 1334(b)? As noted above, the metes and bounds of "arising under" jurisdiction are clear enough: "[a] dispute 'arises under' the Bankruptcy Code when it presents a substantive question of bankruptcy law." *Bush*, 939 F.3d at 844 (citing *Barnett*, 909 F.2d at 981). But what proceedings are within the district court's "arising in" jurisdiction, such that the district court may (as a statutory matter) refer them to the bankruptcy court for final adjudication (though potentially subject to constitutional limitations on a bankruptcy judge's authority) and they are not subject to mandatory abstention?

a

Congress first granted jurisdiction of bankruptcy proceedings using the terms "arising under," "arising in," and "related to" in 1978, when it replaced then-existing bankruptcy law with the Bankruptcy Code. Act of Nov. 6, 1978, Pub. L. No. 95-598, tit. II, §241(a), 92 Stat. 2549, 2668. In the same legislation, Congress amended title 28 to vest jurisdiction in the district courts "of all civil proceedings arising under title 11 or arising in or related to cases under title 11" but tasked the newly formed bankruptcy courts with "exercis[ing] all of th[at] jurisdiction". *Id.*; see *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 54 n.3 (1982) (Brennan, J.) ("[T]he ultimate repository of the Act's broad jurisdictional grant is the bankruptcy courts."); see also *Wellness Int'l*,

575 U.S. at 670 (citation omitted) (quoting *Marathon*, 458 U.S. at 55 (Brennan, J.)) ("Congress thus vested bankruptcy judges with most of the 'powers of a court of equity, law, and admiralty,' without affording them the benefits of Article III.").[18] This "delegation of authority . . . to the Bankruptcy Judges to try cases which are otherwise relegated under the Constitution to Article III judges" was quickly deemed unconstitutional. *Marathon Pipeline Co. v. N. Pipeline Const. Co.*, 12 B.R. 946, 947 (D. Minn. 1981), aff'd, 458 U.S. 50.

To address *Marathon*'s invalidation of the 1978 Act's jurisdictional provisions, Congress passed the Bankruptcy Amendments and Federal Judgeship Act of 1984, which vested the district courts with "original but not exclusive jurisdiction" of bankruptcy proceedings and authorized the district courts to refer all such proceedings to the bankruptcy courts, either for final adjudication or for the submission of "proposed findings of fact and conclusions of law to the district court", but allowed the district court to abstain from exercising its bankruptcy-related jurisdiction and required abstention in some instances. Pub. L. No. 98-353, §§101(a) & 104(a), 98 Stat. 333, 333 & 340–41. The 1984 Act also gave the district courts "exclusive jurisdiction of all of the property . . . of the debtor as of the commencement of [a] case, and of the [bankruptcy] estate." §101(a), 98 Stat. at 333. The 1984 Act—which replaced the former (unrelated) §157, revised §1334, and added §1452—is the source of the statutory language at issue here. See *id.* §§101(a), 103(a) & 104(a); see also 28 U.S.C. §157 (1982) ("Times of holding court"). Much of that language is discussed above, and the initial vesting of jurisdiction

---

18.     There is no majority opinion in *Marathon*. Justice Brennan announced the judgment of the Court and delivered an opinion joined by Justices Marshall, Blackmun, and Stevens. 458 U.S. at 52–89. Justice Rehnquist, joined by Justice O'Connor, concurred in the judgment. *Id.* at 89–92. Chief Justice Burger, Justice White, and Justice Powell dissented. *Id.* at 92–118. Courts, including the Supreme Court, have treated the points of agreement between Justice Brennan's opinion and Justice Rehnquist's concurrence as authoritative. See, e.g., *Stern*, 564 U.S. at 485 (first citing *Marathon*, 458 U.S. at 52 & 87 (Brennan, J.); and then citing *id.* at 91 (Rehnquist, J., concurring in judgment)) (explaining that the Court concluded in *Marathon* that resolution of certain state-law claims by bankruptcy judges under the 1978 Act is unconstitutional).

of bankruptcy proceedings in the district courts (that is, vesting the district courts with "jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11") is the same now as it was in 1978.

Though the 1984 Act retained the earlier nomenclature in vesting jurisdiction in the district courts, its amendment to §157 represents a significant departure from Congress's earlier approach to bankruptcy jurisdiction. Unlike in 1978, when the bankruptcy courts were statutorily empowered to directly exercise the district court's jurisdiction, the 1984 Act affords the district courts discretion to refer most bankruptcy proceedings to their bankruptcy judges (though some proceedings are subject to mandatory abstention in favor of state courts) but limited the authority of those judges to adjudicate some of those proceedings, based on the statute's distinction between "core proceedings" (in which bankruptcy judges can enter final orders and judgments)[19] and "[n]on-core proceedings" (in which they cannot).[20] See §157(a)–(c).[21]

---

[19]    Section 157(b)(1) provides, "Bankruptcy judges may hear and determine . . . all core proceedings arising under title 11, or arising in a case under title 11, referred under [§157](a) . . . , and may enter appropriate orders and judgments, subject to [appellate] review under [28 U.S.C. §]158 . . . ."

[20]    Absent "the consent of all parties to the proceeding", although "[a] bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11", it must "submit proposed findings of fact and conclusions of law to the district court", and the district court must enter "any final order or judgment". §157(c)(1) & (2).

[21]    Although the terminology of "core proceedings" and "non-core proceedings" came from *Marathon* and was new, the general concept underlying this bifurcation of adjudicatory authority was not:

> Prior to 1978, federal district courts could refer matters within the traditional "summary jurisdiction" of bankruptcy courts to specialized bankruptcy referees. Summary jurisdiction covered claims involving "property in the actual or constructive possession of the [bankruptcy] court," *i. e.*, claims regarding the apportionment of the existing bankruptcy estate among creditors. Proceedings to augment the bankruptcy estate, on the other hand, implicated the district court's plenary jurisdiction and were not referred to the bankruptcy courts absent both parties' consent.
>     . . . .
> The 1984 Act largely restored the bifurcated jurisdictional scheme that existed prior to the 1978 Act. The 1984 Act implements that bifurcated scheme by dividing all matters that may be referred to the bankruptcy court into two categories: "core" and "non-core" proceedings.

Again, as Congress made clear, "core proceedings" are ones "arising under" the Bankruptcy Code or "arising in" a bankruptcy case, as opposed to "[n]on-core proceedings", of which the district courts have jurisdiction only because they are "otherwise related to" bankruptcy cases. §157(b)(1), (b)(4) & (c)(1). Section 157(b)(2) "provide[s] a nonexclusive list of proceedings designated as 'core' including two 'catchall' provisions, 'matters concerning the administration of the estate' and 'other proceedings affecting the liquidation of the assets of the estate.'" *Craig v. McCarty Ranch Tr. (In re Cassidy Land & Cattle Co., Inc.)*, 836 F.2d 1130, 1132 (8th Cir. 1988) (citations omitted) (quoting §157(b)(2)(A) & (O)). "[M]ore specific" kinds of "core proceedings" listed in §157(b)(2) "includ[e] 'orders to turn over property of the estate'" under 11 U.S.C. §542(b). *Id.* (quoting §157(b)(2)(E)).

Many of the different types of proceedings Congress identified as "core" in §157(b)(2) are broadly described, but *Marathon* cast a long shadow, so courts read these descriptions narrowly to avoid the kind of constitutional infirmities that doomed the 1978 amendments to title 28. *Piombo Corp. v. Castlerock Props. (In re Castlerock Props.)*, 781 F.2d 159, 162 (9th Cir. 1986) (citing *Cameron v. Anderson (In re Am. Energy, Inc.)*, 50 B.R. 175, 178 (Bankr. D.N.D. 1985)) ("The apparent broad reading that can be given to § 157(b)(2) should be tempered by the *Marathon* decision."). After all, the 1984 amendments to title 28, including their "distinction between core and non-core 'related' matters", was Congress's "direct response to the constitutional concerns addressed in *Marathon*." See *Marshall v. Marshall (In re Marshall)*, 264 B.R. 609, 627 (C.D. Cal. 2001); see also Statement on Signing the Bankruptcy Amendments and Federal Judgeship Act of

---

*Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, at 31–32 & 33 (2014) (citations omitted) (first quoting *Marathon*, 458 U.S. at 53 (Brennan, J.); and then quoting Ralph Brubaker, *A "Summary" Statutory and Constitutional Theory of Bankruptcy Judges' Core Jurisdiction After* Stern v. Marshall, 86 Am. Bankr. L.J. 121, 128 (2012)) (first citing *MacDonald v. Plymouth Cnty. Tr. Co.*, 286 U.S. 263, 266 (1932); then citing Brubaker, *supra*, at 128; and then citing §157).

1984, 2 Pub. Papers 1029 (July 10, 1984) ("The bill restructures the bankruptcy courts system in order to comply with a 1982 decision of the Supreme Court regarding the authority of bankruptcy court judges under the 1978 act."). So, "for fear of emasculating the mandate of *Marathon*", courts concluded that "core proceedings" must be a less inclusive category than §157(b)(2)'s text naturally suggests. *Cassidy Land & Cattle*, 836 F.2d at 1132 (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 95 (5th Cir. 1987)). And, for years, "most courts agree[d]" that construing §157(b)(2) based only on its "literal" or "plain language" was insufficient, because "end[ing] . . . the analysis" there risked "conflict with *Marathon*." See *Marshall*, 264 B.R. at 629.

Though understandable at the time, this constitutional avoidance led to a complicated (and sometimes conflicting) body of caselaw on the meaning of "core" and "non-core" proceedings—much of it concededly at odds with §157(b)(2)'s plain text— that informed judicial constructions of "arising in" and "related to" jurisdiction under §1334(b). For example, many courts concluded that most state-law claims are "core" proceedings only if they fall within one of §157(b)(2)'s non-catchall provisions. See, e.g., *Consol. SWINC Est. v. Ace USA, Inc. (In re Stone & Webster, Inc.)*, 367 B.R. 523, 526 (Bankr. D. Del. 2007) (first citing *Sullivan v. Md. Cas. Co. (In re Ramex Int'l, Inc.)*, 91 B.R. 313, 315 (E.D. Pa. 1988); then citing *Stanger v. Athos Steel& Aluminum, Inc. (In re Athos Steel & Aluminum, Inc.)*, 71 B.R. 525, 534 (Bankr. E.D. Pa. 1987); and then citing *Castlerock Props.*, 781 F.2d at 162) ("[C]ourts generally find that state law causes of action brought by or on behalf of the debtor, which do not fall within the provisions of . . . § 157(b)(2)(B)–(N), are non-core matters.").[22] And, despite any statutory mandate for such a reading,

---

22. The Seventh Circuit's caselaw from this period is not so extreme. *Barnett* explains, "Although many proceedings could be considered to fall within the broad terms of [§157(b)(2)]'s two catch-all provisions, both courts and commentators have noted that expansive interpretations of these provisions may produce results that render superfluous the more specific statutory categories and run afoul of the mandate in *Marathon*." 909 F.2d at 979 (footnotes omitted). But the proceeding at issue in *Barnett* "d[id] not readily fit into any of the[] categories" of "core proceedings" listed in §157(b)(2),

numerous cases state that "arising in" jurisdiction is "limited to administrative matters that arise only in bankruptcy cases and have no existence outside of the bankruptcy proceeding". *Advantage Healthplan, Inc. v. Potter*, 391 B.R. 521, 545 (D.D.C. 2008) (quoting *Premium of Am., LLC v. Sanchez (In re Premium Escrow Services, Inc.)*, 342 B.R. 390, 396 (Bankr. D.D.C. 2006)), aff'd sub nom. *Advantage HealthPlan Inc. v. Potter (In re Greater Se. Cmty. Hosp. Found., Inc.)*, 586 F.3d 1 (D.C. Cir. 2009).[23]

---

including its "catch-all provisions". *Id.* And, in the years after *Barnett*, the Seventh Circuit cited both catch-all provisions in deeming proceedings "core". See *In re Mem'l Ests., Inc.*, 950 F.2d 1364, 1369–70 (7th Cir. 1991) (amended Feb. 26, 1992) (rejecting a party's argument "that the bankruptcy court lacked jurisdiction to impose a $1,000 fine against its attorney" for "fil[ing] a motion . . . which reiterated the same jurisdictional arguments he had made in numerous other pleadings" and "agree[ing] with the district court's reasoning" that "the sanction . . . was a 'core' proceeding" because "the attorney's conduct 'concern[ed] the administration of the estate' and 'affect[ed] the liquidation of the assets of the estate' in violation of § 157(b)(2)(A) and (O)"); see also *Bass v. Fillion (In re Fillion)*, 181 F.3d 859, 862–63 n.4 (7th Cir. 1999) (citing §157(b)(2)(O)) ("The bankruptcy court has concurrent jurisdiction with the state court to adjudicate prepetition, unliquidated claims brought against debtors . . . .").

23. This description of "arising in" jurisdiction—employed here by the District Court for the District of Columbia in determining jurisdiction under §1334(b) of a fee dispute in a bankruptcy case between a committee established by a confirmed chapter 11 plan and its former counsel—has been judicially propagated for decades and traces back to the same Fifth Circuit opinion cited by the Eighth Circuit in *Cassidy Land & Cattle*, quoted above, in support of a narrow construction of "core proceedings" under §157(b): *In re Wood*, 825 F.2d 90. *Cassidy Land & Cattle* cites *Wood* directly, but the path from the D.C. District Court's 2008 opinion in *Advantage Healthplan*, quoted here, back to *Wood* is lengthier: as noted above, *Advantage Healthplan* quotes a 2006 bankruptcy court opinion, *Premium of America*, 342 B.R. at 396, which quotes *Dulworth v. U.S. Office Products Co. (In re U.S. Office Products Co. Securities Litigation)*, 313 B.R. 73, 79 (D.D.C. 2004), which quotes *Atkinson v. Kestell*, 954 F. Supp. 14, 16 (D.D.C. 1997), which quotes *Official Creditors' Committee of Products Liability & Personal Injury Claimants v. International Insurance Co. (In re Pettibone Corp.)*, 135 B.R. 847, 851 (Bankr. N.D. Ill. 1992), which cites *Spaulding & Co. v. Buchanan (In re Spaulding & Co.)*, 131 B.R. 84, 88 (N.D. Ill. 1990), which, finally, quotes *Wood*, 825 F.2d at 97. *Wood* is more hesitant than the cases that carry forward this characterization of "arising in" jurisdiction, however, noting that, compared to proceedings "arising under title 11", "[t]he meaning of 'arising in' proceedings is less clear, but *seems to be* a reference to those 'administrative' matters that arise *only* in bankruptcy cases." 825 F.2d at 97 (first emphasis added). The only authority that *Wood* cites for this construction is a secondary source, the 1987 edition of *Collier on Bankruptcy*. See *id.* at 96–97 nn.32 & 33. This is not to denigrate *Wood*'s analysis. *Wood* carefully considers the text of §157 in light of *Marathon*, narrowing the statute's scope in an effort to protect its constitutionality. *See id.* at 94–98. But *Wood*'s explication of "arising in" jurisdiction is based more on lingering concerns about the issues raised in *Marathon* than it is on the text of §157(b). And the Supreme Court has since renounced this approach, as discussed below. Moreover, while the Seventh Circuit adopted the *Wood* test in *Barnett*, it did so for a limited purpose only: *Barnett* makes clear that "[t]he starting point for determining whether an action is a core proceeding is 28

*Stern*, however, repudiates the lower courts' refusals to apply §157(b)(2) in accordance with its text. The bankruptcy judge in *Stern* had "enter[ed] final judgment" on a debtor's "counterclaim [against a creditor] for tortious interference with [a] gift she expected from [her late husband]", concluding that the counterclaim "was 'a core proceeding' under §157(b)(2)(C)." 564 U.S. at 469, 470, & 471.[24] On the issue of the bankruptcy judge's authority to enter a final judgment, the district court reversed, concluding that, although the "counterclaim . . . falls within the literal language of § 157(b)(2)(C) . . . . , considering both the general rule behind the core classification, which stems from the constitutional concerns of *Marathon*, and also the specific policy that underlies § 157(b)(2)(C), . . . the counterclaim is not core." *Marshall*, 264 B.R. at 629 &

---

U.S.C. § 157(b)(2), which contains a nonexclusive list of matters that are considered 'core proceedings.'" 909 F.2d at 979. As the proceeding at issue in *Barnett* "d[id] not readily fit into any of these categories", the Seventh Circuit turned to *Wood* as "general guidance for determining when a matter *that does not readily fit within the enumerated statutory categories* is a core proceeding." *Id.* at 981 (emphasis added). Only then, and for this limited purpose, did the Seventh Circuit adopt the *Wood* test: "[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Id.* (quoting *Wood*, 825 F.2d at 97). The Seventh Circuit has generally, if implicitly, stuck to this approach, relying on §157(b)(2)'s list of "core" proceedings when possible and only applying the *Wood* test to proceedings that do not readily fit into any of the categories of "core" proceedings listed in §157(b)(2). See *Ortiz*, 665 F.3d at 909 & 911–12 (quoting *Repository Techs.*, 601 F.3d at 719) (holding that claims by the debtors alleging that a creditor violated state law "by filing proofs of claim revealing their medical information" were proceedings "arising in" the underlying bankruptcy cases "because the claims [we]re 'predicated on the defendants' participation in' the debtors' bankruptcies" and thus "would have 'no existence outside of the bankruptcy'"); *Repository Techs.*, 601 F.3d at 719–21 (holding that state-law claims alleging "civil conspiracy and tortious interference with a contract" were proceedings "arising in" the underlying bankruptcy case because they were "predicated on the defendants' participation in" the bankruptcy case and alleged abuse of the bankruptcy process). Compare *Bush*, 939 F.3d at 842–44 (holding that the debtors' request under 11 U.S.C. §505(a)(1) for a determination of the amount of a tax-related penalty assessed by the Internal Revenue Service was a "non-core" proceeding merely "related to" the bankruptcy case because the "dispute's substance depend[ed] on the Internal Revenue Code, not the Bankruptcy Code", and "[m]ost tax disputes are resolved outside of bankruptcy"), with *Bulk Petroleum Corp. v. Ky. Dep't of Revenue (In re Bulk Petroleum Corp.)*, 796 F.3d 667, 670 (7th Cir. 2015) (holding that the debtor's objection to a claim of a state taxing authority and the debtor's adversary proceeding seeking a refund from the taxing authority "was a core proceeding" under §157(b)(2)(B) & (E), which defines "core proceedings" to include "the allowance or disallowance of claims against the estate" and "orders to turn over property of the estate").

     24.     As noted above, §157(b)(2)(C) states that "[c]ore proceedings include . . . counterclaims by the estate against persons filing claims against the estate".

631. "[T]he District Court . . . went on to decide the matter itself", then "[t]he Court of Appeals reversed the District Court on a different ground", and then the Supreme Court "reversed the Court of Appeals on that issue." *Stern*, 564 U.S. at 472 (first citing *Marshall v. Marshall (In re Marshall)*, 271 B.R. 858, 862–67 (C.D. Cal. 2001); then citing *Marshall v. Marshall (In re Marshall)*, 275 B.R. 5, 56–58 (C.D. Cal. 2002); then citing *Marshall v. Marshall (In re Marshall)*, 392 F.3d 1118, 1137 (9th Cir. 2004); and then citing *Marshall v. Marshall*, 547 U.S. 293, 314–15 (2006)).

On remand, the Ninth Circuit "held that § 157 mandate[s] 'a two-step approach' under which a bankruptcy judge may issue a final judgment in a proceeding only if the matter both 'meets Congress' definition of a core proceeding *and* arises under or arises in title 11,' the Bankruptcy Code." *Id.* at 472 (quoting *Marshall v. Stern (In re Marshall)*, 600 F.3d 1037, 1055 (9th Cir. 2010)). The Ninth Circuit considered the debtor's view "that her counterclaim falls within [§157(b)'s] plain language definition of a 'core proceeding' as a 'counterclaim[ ] by the estate against persons filing claims against the estate'" and "that . . . the '"core proceedings" listed in § 157(b), by definition, meet the arising in/arising under standard.'" *Marshall*, 600 F.3d at 1056 (alterations in original) (quoting debtor's supplemental brief). The Ninth Circuit rejected this reading, however, reasoning that it "sweeps too broadly and would permit the bankruptcy court to consider under § 157(b)(2)(C) counterclaims that are factually and legally unrelated to the claim being asserted against the bankruptcy estate", which "would certainly run afoul of the [Supreme] Court's holding in *Marathon*" and "would also arguably be inconsistent with Congress' intent to revise the Bankruptcy Code in a manner consistent with the principles of *Marathon* to make its jurisdictional grant constitutional." *Id.* at 1057.

Under its two-step approach, the Ninth Circuit held that "a counterclaim under § 157(b)(2)(C) is properly a 'core' proceeding 'arising in a case under' the [Bankruptcy] Code only if the counterclaim is so closely related to [a creditor's] proof of claim that the

resolution of the counterclaim is necessary to resolve the allowance or disallowance of the claim itself." *Stern*, 564 U.S. at 472 (alterations in original) (quoting *Marshall*, 600 F.3d at 1058). "The court ruled that [the debtor's] counterclaim did not meet that test." *Id.* (citing *Marshall*, 600 F.3d at 1059). The Supreme Court again granted review.

The Supreme Court expressly rejected the view, adopted by the Ninth Circuit in *Stern* and in many of the other cases discussed above, "that there is a category of core proceedings that neither arise under Title 11 nor arise in a Title 11 case", reasoning that "[t]he manner in which [§157] delineates the bankruptcy courts' authority . . . makes plain that no such category exists." *Id.* at 476. To the contrary, the Court concluded, "core proceedings are those that arise in a bankruptcy case or under Title 11." *Id.* Accordingly, the Court held that, "under the plain text of § 157(b)(2)(C)", which "specifies that core proceedings include 'counterclaims by the estate against persons filing claims against the estate'", the debtor's "counterclaim . . . for tortious interference is a 'core proceeding'". *Id.* at 475.

That was not the end of the matter. *Stern* further holds, "Although . . . § 157(b)(2)(C) permits the Bankruptcy Court to enter final judgment on [the debtor's] counterclaim, Article III of the Constitution does not." *Id.* at 482; see *id.* at 487 & 495 (describing the debtor's counterclaim as "a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy" and "one at common law that simply attempts to augment the bankruptcy estate"). *Stern* thus makes clear that there are "claim[s] designated for final adjudication in the bankruptcy court as a statutory matter", because they are "core proceedings" under §157(b), that a bankruptcy judge cannot finally adjudicate "as a constitutional matter." *Exec. Benefits*, 573 U.S. at 30–31 (referring to these as "*Stern*

claims").[25] But *Stern* also recognizes that—unlike the 1978 amendments to title 28,

---

25. The Court described *Stern's* holding as a narrow one. See *Stern*, 564 U.S. at 502 & 503 ("We do not think the removal of counterclaims such as [the debtor]'s from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; . . . the question presented here is a 'narrow' one. . . . Article III of the Constitution provides that the judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in that Article. We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984."). Some lower courts have therefore applied *Stern* only to "counterclaims by the estate against persons filing claims against the estate" under §157(b)(2)(C), not to other kinds of "core proceedings"—especially those under §157(b)(2)'s so-called catchall provisions, subparagraphs (A) and (O), which respectively provide that "core proceedings" include "matters concerning the administration of the estate" and most "proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship"—though these courts seem to have done this to preserve, rather than limit, a bankruptcy judge's authority to adjudicate such claims. See, e.g., *Walker v. Directory Distrib. Assocs., Inc. (In re Directory Distrib. Assocs., Inc.)*, 566 B.R. 869, 876 (Bankr. S.D. Tex. 2017) (first citing *Tanguy v. West (In re Davis)*, 538 Fed. App'x 440, 443 (5th Cir. 2013); and then citing *Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (8th Cir. B.A.P. 2012)) ("Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding [under §157(b)(2)(C)] . . . , this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order here [on a claim under §157(b)(2)(A)]."). The Supreme Court has since discussed *Stern* in the context of other kinds of "core proceedings", though without deciding for itself whether the claims at issue were, in fact, *Stern* claims. See *Exec. Benefits*, 573 U.S. at 29 n.1 & 35–40 (considering the application of §157(c)(1) to a bankruptcy trustee's "claims of fraudulent conveyance under 11 U.S.C. § 548[] and . . . state law", but "assum[ing] without deciding[] that the[se] fraudulent conveyance claims . . . are *Stern* claims" because "[t]he Ninth Circuit held—and no party disputes—that Article III does not permit these claims to be treated as 'core'"); see also *Wellness Int'l*, 575 U.S. at 669, 672 & 674 n.7 (considering the application of §157(c)(2) to a creditor's claim that a trust was the debtor's "alter ego and that its assets should therefore be treated as part of [the] bankruptcy estate", but "express[ing] no view on" whether that claim "was a *Stern* claim"). Thus, the Court has not applied *Stern* to a "core proceeding" other than those under §157(b)(2)(C). The Seventh Circuit has avoided the issue in its own post-*Stern* cases, including in *Wellness International*. See 727 F.3d 751, 762 (7th Cir. 2013) ("proceed[ing] on the assumption that the alter-ego claim was a core proceeding over which the bankruptcy court had authority under § 157(b)(1) to enter final judgment" because the debtor "never argued in either the bankruptcy court or the district court that the alter-ego claim was a noncore matter" and therefore "waived the issue"), rev'd on other grounds, 575 U.S. 665; see also *Matrix IV, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 649 F.3d 539, 550–52 (7th Cir. 2011) (noting that, under §157(b)(2)(K) & (N), "'core' proceedings . . . include 'determinations of the validity, extent, or priority of liens' and 'orders approving the sale of property'"; declining to consider "the effect of *Stern* on [the court's] reasoning in *Barnett*", that "the claim-preclusive effect of bankruptcy-court orders" depends on "the core/noncore distinction", because the parties did not brief that issue; and "resolv[ing] th[e] case" on "[the] narrower ground" of "collateral estoppel"). Still, lower courts are generally bound not only by the narrowly expressed holdings of opinions from higher courts, but also by their rationales. See *United States v. Bloom*, 149 F.3d 649, 653 (7th Cir. 1998) (citing *United States v. Crawley*, 837 F.2d 291 (7th Cir. 1988)) (explaining that a statement in a Supreme Court opinion that "explains the Court's rationale . . . is part of the holding"). And the Supreme Court's

discussed above—"the framework Congress adopted in the 1984 Act . . . contemplates that certain state law matters in bankruptcy cases will be resolved by judges other than those of the bankruptcy courts." *Stern*, 564 U.S. at 502. For example, "[§] 1334(c)(1) . . . provides that bankruptcy courts may abstain from hearing any proceeding, including core matters, 'in the interest of comity with State courts or respect for State law'", and §157(d) "permits the district court to withdraw from the bankruptcy court any referred case, proceeding, or part thereof." *Id.* (citation omitted).

The Supreme Court subsequently held, in *Executive Benefits*, that a bankruptcy judge confronted with a "*Stern* claim"—i.e., one in the "class of bankruptcy-related claims" identified in *Stern*, on which "bankruptcy courts are statutorily authorized to enter final judgment" but prohibited by "Article III of the Constitution" from doing so—must "issue proposed findings of fact and conclusions of law to be reviewed *de novo* by the district court" under §157(c)(1). 573 U.S. at 28 & 31 (describing this as "the proper course"). The Court explained, "When a court identifies a claim as a *Stern* claim, it has necessarily 'held invalid' the 'application' of § 157(b)—i.e., the 'core' label and its attendant procedures—to the litigant's claim." *Id.* at 36 (quoting §151 note (Provisions Held Invalid), 98 Stat. at 344). In the absence of party consent, a bankruptcy court may

---

rationale for its holding in *Stern*—that bankruptcy judges cannot exercise adjudicatory authority granted by Congress in a statute if doing so would violate Article III of the Constitution—is not easily cabined to "core proceedings" under §157(b)(2)(C). See 564 U.S. at 499 (discussing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989)) ("Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case . . . ."). Indeed, the Court explained, quite broadly, in *Stern*, quoting a case that has nothing to do with bankruptcy and citing the foundational commentary on the Constitution, "If . . . the bankruptcy court itself exercises 'the essential attributes of judicial power [that] are reserved to Article III courts,' it does not matter who appointed the bankruptcy judge or authorized the judge to render final judgments in such proceedings. The constitutional bar remains." *Id.* at 501 (citation omitted) (quoting *CFTC v. Schor*, 478 U.S. 833, 851 (1986)) (citing The Federalist No. 78 (Alexander Hamilton)). None of this is particularly germane to the present dispute—as explained both above and below, for the moment, the relevant issue is whether §1334(c)(2) mandates abstention with respect to any of the parties' removed claims and counterclaims, not whether, under §157(b) and *Stern*, the bankruptcy court has both the statutory and the constitutional authority to enter a judgment finally adjudicating those claims and counterclaims if abstention is not required—but it bears emphasizing that *Stern*'s holding implicates "core proceedings" beyond those under §157(b)(2)(C).

only adjudicate a *Stern* claim—core under §157(b)(2) but constitutionally reserved for final adjudication by an Article III judge—in the same manner as a non-core proceeding under §157(c)(1). *Id.* "If the claim satisfies the criteria of § 157(c)(1), the bankruptcy court simply treats the claims as non-core" and "should hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for *de novo* review and entry of judgment." *Id.*

But nothing in *Executive Benefits*, Article III, or §157 suggests that this reasoning applies beyond the specific matter addressed: how a bankruptcy court may adjudicate a *Stern* claim.[26] *Stern* holds that the application of §157(b) to a "core proceeding" is invalid where it would violate Article III for a bankruptcy judge to enter final judgment, and *Executive Benefits* holds that the bankruptcy judge must proceed with respect to such a claim as if it were "non-core within the meaning of §157(c)." *Id.* This does not, however, affect *valid* applications of §157(b) to core proceedings—including its identification of proceedings "arising under" the Bankruptcy Code or "arising in" a bankruptcy case— much less §1334(b)'s grant to the *district* courts of jurisdiction of bankruptcy proceedings or §1334(c)(2)'s mandate of abstention from hearing certain claims.[27]

b

*Stern* makes clear two principles applicable to the parties' dispute about

---

26. To the contrary, the Court's holding is grounded in "the statute['s] . . . severability provision", which "accounts for decisions, like *Stern*, that invalidate certain *applications* of the statute" by providing, "If any provision of this Act or *the application thereof to any person or circumstance* is held invalid, the remainder of this Act . . . is not affected thereby." *Exec. Benefits*, 573 U.S. at 36 (emphasis added) (quoting 98 Stat. at 344, §151 note).

27. As one bankruptcy court observed, "*Stern* does not limit a bankruptcy court's subject matter jurisdiction, only its constitutional authority to hear matters otherwise within its jurisdiction—the so-called '*Stern* claims.'" *Smith v. Wilburn (In re Delta Invs. & Dev., LLC)*, No. 17-00067, 2019 WL 137578, at *11 (Bankr. S.D. Miss. Jan. 8, 2019). "A bankruptcy court's subject matter jurisdiction is set forth in . . . § 1334; its statutory authority is set forth in . . . § 157; its constitutional powers are dictated by the scope of authority allocated the tribunals created under Articles I and III of the U.S. Constitution." *Id.* But see *supra* note 11 (explaining that §1334 sets forth the *district* courts' subject matter jurisdiction and §157(a) permits the district court to refer proceedings within its jurisdiction to the district's bankruptcy judges).

jurisdiction and mandatory abstention under §1334(c)(2): First, claims "arising under" the Bankruptcy Code or "arising in" a bankruptcy case include those that §157(b)(2) expressly designates as "core proceedings". See 564 U.S. at 476 (rejecting a "reading of § 157" that "supposes that some core proceedings will arise in a Title 11 case or under Title 11 and some will not"); *supra* note 14. Second, whether a claim is a "core proceeding" depends on the plain text of §157(b), namely the illustrative list of "core proceedings" in §157(b)(2). See 564 U.S. at 475–78 (concluding that the debtor's "counterclaim . . . for tortious inference is a 'core proceeding' under the plain text of § 157(b)(2)(C)" and rejecting arguments to the contrary, reasoning that "the plain text of § 157(b)(2)(C) leaves [no] room for the canon of [constitutional] avoidance").

The defendants agree that "claims enumerated in § 157(b)(2)" cannot "be considered statutorily non-core after the *Stern* decision", which is essentially the second of the principles stated in the previous paragraph. See ECF No. 25, at 9 ("Claims specifically enumerated in § 157(b)(2) are statutorily considered core claims based upon the Supreme Court's decision in *Stern*.").[28] Still, as already noted, they dispute whether

---

28.     The defendants assert that "[t]his does not . . . end the analysis, as constitutional considerations are also necessary to determine whether the Bankruptcy Court can enter final orders or final judgments." ECF No. 25, at 9 (citing *Stern*, 564 U.S. at 482). This is true, but it is not the issue currently before this court. Jurisdiction under §1334 is the issue of the day. Whether, under *Stern*, this court is able to enter final judgment on all of the parties' removed claims and counterclaims, if it has jurisdiction over those claims, is an issue that has not yet been properly raised, briefed, or argued. In the absence of the parties' consent, this court perhaps cannot enter final judgment on at least some of the removed claims and counterclaims, especially those by Jackson Family Dentistry, because they "seek only to 'augment' the bankruptcy estate and would otherwise 'exis[t]' without regard to any bankruptcy proceeding'", and *Stern* holds "that Article III prevents bankruptcy courts from entering final judgment on [such] claims". See *Wellness Int'l*, 575 U.S. at 673 (first alteration in original) (quoting *Stern*, 564 U.S. at 492 & 499). But even if this court cannot enter final judgment on some of the parties' removed claims and counterclaims, the court can, if necessary, treat them as "non-core" proceedings under §157(c)(1), as *Executive Benefits* holds, unless one or more of the parties is entitled to, and demands, a jury trial on one or more of the removed claims and counterclaims, in which case, the district court can conduct such a trial (or this court can, if designated to do so and with the parties' express consent, see §157(e)). See *infra* note 35. More to the point, whether the provisions of §157(b) may be applied, without violating Article III, to permit a bankruptcy judge to enter final judgment on any of the removed claims and counterclaims

Charmoli's removed claims against them and the removed claims by and against Jackson Family Dentistry are "core proceedings". See *id.* at 3–7.

As mentioned earlier, among the "core proceedings" listed in §157(b)(2) are "proceedings affecting the liquidation of the assets of the estate". §157(b)(2)(O). Charmoli and his wife filed a plan proposing to liquidate the estate's assets, including Charmoli's removed claims against the defendants and his membership interest in Jackson Family Dentistry, to pay the estate's creditors. See Case No. 22-24358, ECF No. 110, at 4 ("[T]he Debtors propose[] to make payments from the liquidation of assets."). The Charmolis' bankruptcy plan lists Charmoli's removed claims against the defendants and his membership interest in Jackson Family Dentistry as property of the bankruptcy estate that they intend to liquidate to pay their creditors. *Id.* at 11–12 (listing "Jackson Family Dentistry, LLC", "Wage Claim (Contingent)", and "Claim against Buyer (Contingent)").[29] And Jackson Family Dentistry is a dissolved LLC governed by

has no bearing on whether those claims and counterclaims are proceedings "arising under" the Bankruptcy Code or "arising in" a bankruptcy case, as opposed to merely "related to" a bankruptcy case, for purposes of applying the provisions of §1334 to those claims and counterclaims. See *supra* note 27 and accompanying text.

29. The defendants note, in their reply brief, that the liquidation analysis filed by the Charmolis with their plan "ascribes no value to the [removed] claims" in this proceeding and similarly "puts no value on . . . [Charmoli]'s interest in Jackson Family Dentistry." ECF No. 18, at 5 & 8. This is true, but not significant. The removed claims are currently unliquidated, and the Charmolis simply declined to estimate their value in the liquidation analysis filed with their plan. In their schedule of assets (schedule A/B), the Charmolis value the sole interest in Jackson Family Dentistry at $0, but they estimate that the removed claims for breach of the promissory note and to enforce the guaranty and security agreement—collectively listed in the liquidation analysis as "Claim against Buyer (Contingent)", Case No. 22-24358, ECF No. 110, at 12—are worth $1,500,000. Case No. 22-24358, ECF No. 1, at 64 & 67. Charmoli seems not to be a party to any of those agreements, so the value of the removed claims arising from them is likely attributable to Jackson Family Dentistry (and by extension, the sole interest in it) alone. See *supra* notes 4–6 and accompanying text. And despite not valuing the "Wage Claim (Contingent)" in the liquidation analysis filed with their plan, the Charmolis' schedule of assets (schedule A/B) estimates that Charmoli's claim against Jackson Family Dental, for breach of the employment agreement between them, is worth $100,000. Compare Case No. 22-24358, ECF No. 110, at 12, with *id.* at 66. Accordingly, the record in the underlying bankruptcy case makes clear that the Charmolis contend that both their removed claims against the defendants and the sole interest in Jackson Family Dentistry are worth a substantial amount. Indeed, that they are actively attempting, through litigation, to recover

Wisconsin law, which not only *requires* that a dissolved LLC and any interests in it be liquidated but provides that a dissolved LLC continues to exist *only* for the purpose of its liquidation. See Wis. Stat. §183.0702(1).[30]

Chamoli's removed claims against the defendants and all the removed claims and counterclaims by and against Jackson Family Dentistry are "core proceedings" within the plain language of §157(b)(2)(O). Charmoli's claims are property of the bankruptcy estate. See 11 U.S.C. §541(a)(1) (Subject to certain exceptions that are not applicable here, commencing a bankruptcy case "creates an estate. Such estate is comprised of . . . all legal or equitable interests of the debtor in property as of the

---

the value of those claims and the interest in Jackson Family Dentistry suggests as much. That the defendants have not sought an order requiring the Charmolis to abandon those estate assets suggests that they agree (or, at least, that they do not think it is so obvious that these assets are not worth the costs of liquidating them). See *infra* note 33.

     30.     Wisconsin Statutes section 183.0702(1) provides, "A dissolved limited liability company shall wind up its activities and affairs and"—subject only to section 183.0703, which permits "[a] limited liability company [to] rescind its dissolution"—"the limited liability company continues after dissolution only for the purpose of winding up." Section 183.0702(2)(a) provides, "In winding up its activities and affairs, a limited liability company shall discharge the company's debts, obligations, and other liabilities, settle and close the company's activities and affairs, and marshal and distribute the assets of the company." "In winding up its activities and affairs, a limited liability company may . . . [p]rosecute and defend actions and proceedings, whether civil, criminal, or administrative", "[s]ettle disputes by mediation or arbitration", and "[p]erform other acts necessary or appropriate to the winding up." §183.0702(2)(b)(3), (5) & (7). Section 183.0707(1) provides, "In winding up its activities and affairs, a limited liability company shall apply its assets to discharge its obligations to creditors". "[A]ny surplus must be distributed . . . [t]o members and dissociated members" as and in the order specified in section 183.0707(2). The end result is the liquidation of the company: its assets are reduced to money, by sale, litigation, etc.; that money is used to pay off its creditors; and any money left over after that is distributed to its members. This last step amounts to the liquidation of the membership interests in the company. Each membership interest is reduced to cash in the amount of the distribution to which each member is entitled or, if the amount of the dissolved company's liabilities exceeds the value of its assets, effectively deemed worthless. See §183.0707(4) (requiring that "[a]ll distributions" to members and dissociated members of a dissolved LLC "must be paid in money"). It is, of course, commonplace to think of liquidation of an asset as disposing of the asset in return for cash (or some equivalent), but "liquidation" also refers, more broadly, to the determination of the amount of something, such as damages recoverable on a claim, which may be nothing. See *Black's Law Dictionary*, *supra*, at 1116 (defining "liquidate" to mean "[t]o ascertain the precise amount of (debt, damages, etc.) by litigation or agreement", "[t]o determine the liabilities and distribute the assets of (an entity), esp. in bankruptcy or dissolution", "[t]o convert (a nonliquid asset) into cash", and "[t]o wind up the affairs of (a corporation, business, etc.)").

commencement of the case" "wherever located and by whomever held"). Litigating those claims not only *affects*, but *effects*, their liquidation, which is more than sufficient to satisfy §157(b)(2)(O).[31] Indeed, the debtor in possession's ability to settle or otherwise compromise those claims, as property of the estate, is a matter within the exclusive jurisdiction of the district court under §1334(e)(1), which grants "[t]he district court in

---

[31]      The Seventh Circuit has cast some pre-petition claims of debtors as "non-core" proceedings, and thus merely "related to" a bankruptcy case. For example, in *Diamond Mortgage Corp.*, the court explained that a suit brought by two related corporate debtors in pending chapter 11 cases against their former attorneys, alleging malpractice and breach of fiduciary duties before the bankruptcy cases were commenced, was "related to their underlying bankruptcy cases", and therefore "non-core", because "its resolution may have a direct and substantial impact on the asset pool available for distribution to the estates." 913 F.2d at 1239. While the court noted that "[t]he suit clearly does not satisfy the test for determining whether a suit is a core proceeding, arising under Title 11", it did not separately address whether the suit was a proceeding "arising in" the underlying bankruptcy cases. 913 F.2d at 1238–39. This may be because whether the suit was "core" or "non-core" was immaterial to the court's holding—that Part VII of the Federal Rules of Bankruptcy Procedure apply to bankruptcy proceedings without regard to whether they are "core" or "non-core" proceedings such that the district court was authorized to exercise personal jurisdiction over the defendants by nationwide service of process. See *id.* at 1243–44 & 48; see also *Georgou v. Fritzshall*, 178 F.3d 453, 454 (7th Cir. 1999) (citing §157(c)(1)) (explaining that debtors' claims for malpractice against an attorney who represented them in pre-petition state-court litigation were "related to the bankruptcies in the sense that creditors will be the beneficiaries").

Similarly, in *UNR Industries, Inc. v. Continental Casualty Co.*, the Seventh Circuit explained that the district court "had subject matter jurisdiction under 28 U.S.C. § 1334(b)" of a dispute about the debtor's "interest, if any," in certain insurance policies, because "[t]he scope of [the debtor's] interest 'affects the amount of property available for distribution,'" and the debtor's coverage claims were therefore "'related to' the bankruptcy". 942 F.2d 1101, 1103 (7th Cir. 1991) (quoting *Elscint, Inc. v. First Wis. Fin. Corp. (In re Xonics, Inc.)*, 813 F.2d 127, 131 (7th Cir. 1987)). Again, the court did not discuss whether the debtor's claims were property of the bankruptcy estate within the district court's exclusive jurisdiction—and, again, they may not have been, at least by the time the Seventh Circuit heard the case, as the notice of appeal was filed nearly a year after the bankruptcy court confirmed the plan of reorganization, which likely vested the estate property, including the coverage claims, in the debtor, as discussed above. *Id.* at 1104 (noting that the plan was confirmed on June 1, 1989); see *UNR Indus. Inc. v. Cont'l Cas. Co.*, No. 90-2188 (7th Cir. notice of appeal filed May 25, 1990). The court did not discuss the possibility that the claims were proceedings either "arising under" the Bankruptcy Code or "arising in" the bankruptcy case, but again, it sufficed to say that the claims were "related to" the bankruptcy case because the relevant issue before the Seventh Circuit was resolved by the court's conclusion that the district court *had* jurisdiction; the *kind* of jurisdiction did not matter. Indeed, the court's opinion suggests that the parties did not *contest* that the district court had jurisdiction. See also *Home Ins. Co. of Ill. v. Adco Oil Co.*, 154 F.3d 739, 741 (7th Cir. 1998) (first citing *UNR Indus.*, 942 F.2d at 1103; then citing *Xonics*, 813 F.2d at 131–32; then citing §157(b)(3); and then citing §1334(b)) (describing a claim by a debtor's malpractice insurance provider against one of the debtor's creditors as "within the bankruptcy court's ['related-to'] jurisdiction" because "the disposition of the claim may affect how much [the] creditors receive").

which a [bankruptcy] case . . . is commenced or is pending . . . exclusive jurisdiction . . . of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate . . . ."

Jackson Family Dentistry's removed claims against the defendants are not property of the estate—nor are the defendants' removed counterclaims against Jackson Family Dentistry—but Charmoli's membership interest in Jackson Family Dentistry is property of the estate. And, again, the Charmolis, as debtors in possession, have opted to liquidate that interest, at least in part, by litigating Jackson Family Dentistry's removed claims against the defendants, as well as their removed counterclaims against it. (Moreover, as already stated, Wisconsin law requires that Jackson Family Dentistry be liquidated—and the sole membership interest along with it—because it is dissolved.)

The defendants, as mentioned earlier, note that there may be other claims against Jackson Family Dentistry that must be resolved in fully liquidating the membership interest, namely claims against it by Charmoli's former patients. See *supra* note 12. But even if that is true, Jackson Family Dentistry's *only* assets appear to be its removed claims against Major Dental Partners and Dr. Major, Case No. 22-24358, ECF No. 1, at 64—after all, the central agreement between the parties, from which their present disputes arose, was for Jackson Family Dentistry's sale of substantially all of its assets to Major Dental Partners. See *supra* note 4 and accompanying text. And the defendants' removed counterclaims against Jackson Family Dentistry seem to represent its largest potential liabilities, by far, as the only other potential liabilities of Jackson Family Dentistry of which the court is aware are "claims against [Charmoli] for damaging patients' teeth while he owned and operated Jackson Family Dentistry", which the defendants note "would undoubtedly be asserted against . . . the practice", as well, ECF No. 25, at 6, and based on the proofs of claim in the underlying bankruptcy case, Major Dental Partners and Dr. Major are seeking far more, in damages for breach of the asset purchase agreement and the duty of good faith and fair dealing, than are any of

Charmoli's former patients. Accordingly, the resolution of the removed claims and counterclaims by and against Jackson Family Dentistry stands to accomplish the liquidation of its discernable assets and its most substantial potential liabilities, which undoubtedly "affect[s] the liquidation of [an] asset[] of the estate", the only membership interest in it. §157(b)(2)(O).

The defendants' arguments to the contrary—that the claims by and against Jackson Family Dentistry are not "core" proceedings, i.e., that they are no more than "related to" the bankruptcy case—are unconvincing. In their motion, they repeat the pre-*Stern* mantra that "arising in" jurisdiction is "limited to administrative matters that arise only in bankruptcy cases and have no existence outside of the bankruptcy proceeding." ECF No. 9, at 6 (quoting *Advantage Healthplan*, 391 B.R. at 546). The only case they cite here is not controlling law; the jurisdictional limitations that case espouses predate and were repudiated by *Stern*, as discussed above. See *supra* note 23.

In their supplemental brief, the defendants argue that §157(b)(2)'s two "catch all categories", §157(b)(2)(A) & (O), "should be given a narrow interpretation" and that "the preferable path is to deem matters core under the more specific examples of § 157(b)(2)." ECF No. 25, at 4 (quoting *Waldron v. Perkins Coie, LLP (In re Giga Watt, Inc.)*, No. 20-80031, 2021 WL 1584527, at *2 (Bankr. E.D. Wash. Apr. 22, 2021)) (first citing *Cassidy Land & Cattle*, 836 F.2d at 1132; then citing *Bianco v. Hoehn (In re Gaston & Snow)*, 173 B.R. 302, 305 (S.D.N.Y. 1994); then citing *Directory Distrib. Assocs.*, 566 B.R. at 878; and then citing *N.J. Dep't Env't Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.)*, 560 B.R. 111, 121–22 (Bankr. D. Del. 2016)). Again, none of the cases defendants rely on are binding on this court, and, again, those cases are unpersuasive because they either predate *Stern* or rely on pre-*Stern* authority that is no longer compelling. For example, the defendants quote a post-*Stern* case stating that "courts generally find that state law causes of action brought by or on behalf of the debtor, which do not fall within the provisions of . . . § 157(b)(2)(B)-(N), are non-core matters", but this language is from a

pre-*Stern* case. ECF No. 25, at 4 (quoting *Maxus Energy*, 560 B.R. at 121–22, which itself is quoting *Stone & Webster*, 367 B.R. at 526). And that pre-*Stern* case, *Stone & Webster*, cites many of the pre-*Stern* cases discussed above, including the Ninth Circuit's 1986 opinion in *Castlerock Properties*, 781 F.2d 159, and the Fifth Circuit's 1987 opinion in *Wood*, 825 F.2d 90. See *Stone & Webster*, 367 B.R. at 526; *supra* note 23. As previously discussed, those pre-*Stern* cases are based, more than anything else, on the kind of constitutional avoidance that *Stern* rejects in its interpretation of §157(b)(2)'s description of "core" proceedings. See 564 U.S. at 478 ("[W]e do not think the plain text of § 157(b)(2)(C) leaves any room for the canon of avoidance.").

As already discussed, *Stern* concerns only the application of §157(b) to a claim where "Article III of the Constitution does not" permit a bankruptcy judge to enter final judgment on it. *Stern*, 564 U.S. at 482; see also *Exec. Benefits*, 573 U.S. at 35–37. *Stern* does not implicate the validity of any application of §1334(c)(2), which makes no mention of the *bankruptcy* court and requires abstention by the *district* court in certain circumstances with respect to a proceeding that is merely "related to" a bankruptcy case (i.e., is not "core" under §157(b)). (Nor, for that matter, does *Marathon*, which concerns the constitutional validity of a statute nominally vesting the district courts with jurisdiction to finally adjudicate all manner of bankruptcy and bankruptcy-related proceedings but actually requiring the bankruptcy courts to exercise the entirety of that jurisdiction.) Determining whether a bankruptcy proceeding is subject to mandatory abstention requires an application of §1334(c)(2), not §157(b). Section 157(b) is relevant to an application of §1334(c)(2) only to the extent that §157(b)(2) defines whether a claim is a "core proceeding" (and therefore whether the claim is a proceeding "arising under" the Bankruptcy Code or "arising in" a bankruptcy case). See *supra* note 14. Nothing in *Marathon*, *Stern*, or any case the defendants cite suggests constitutional infirmity in this.

The defendants also assert, with respect to §157(b)(2)(O), specifically, that "[w]hile debtors often argue that pre-petition litigation falls under the language of this

provision, courts are reluctant to apply this provision to general litigation claims". ECF No. 25, at 5 (first citing *Montoya v. Curtis (In re Cashco, Inc.)*, 614 B.R. 715, 720 (Bankr. D.N.M. 2020); and then citing *Scott v. Am. Sec. Ins. Co. (In re Scott)*, 572 B.R. 492, 519 (Bankr. S.D.N.Y. 2017)). According to one of the cases the defendants cite here, "[t]o interpret the language of § 157(b)(2)(O) so broadly would render the distinction between core and non-core claims meaningless." *Scott*, 572 B.R. at 520 (quoting *Complete Mgmt., Inc. v. Arthur Andersen, LLP (In re Complete Mgmt., Inc.)*, No. 01-03459, 2002 WL 31163878, at *3 (S.D.N.Y. Sept. 27, 2002)) (first citing *Castlerock Props.*, 781 F.2d at 162; and then citing *Tultex Corp. v. Freeze Kids LLC*, 252 B.R. 32, 39 (Bankr. S.D.N.Y. 2000)). *Scott* is a post-*Stern* case, but it is not binding on this court, and it relies in relevant part on pre-*Stern* authority, so it is not persuasive.

Still, the defendants' broad point here is sound—§157(b)(2)(O) should not be read so expansively as to obliterate any key distinctions in the statute—but §157(b)(2)(O)'s plain language obviates this purported concern. Section 157(b)(2)(O) describes a broad category of "core proceedings" made up of most "proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship", but it expressly excludes from that category "personal injury tort [and] wrongful death claims". See also §157(b)(2)(B) (similarly excluding "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11" from its description of the following class of "core proceedings": "allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11").[32] This carve-out ensures that

---

[32]  Legislative history suggests that personal-injury claims are excluded from "core proceedings" under §157(b)(2)(B) to specifically distinguish such claims from contract claims. On May 21,

1984, the Senate considered amendments to House Bill 5174—which would, as amended, be enacted that July, as the Bankruptcy Amendments and Federal Judgeships Act of 1984. Under that bill, as passed that March by the House of Representatives, §157(b)(2)(B) would have defined "core proceedings" to include "allowance or disallowance of claims against the estate or exemptions from property of the estate". H.R. 5174, 98th Cong. §104(a) (1984). One Senator proposed adding "[l]anguage . . . to subsection (b)(2)(B) to clarify that allowance or disallowance of claims against the estate or exemptions from property of the estate does not include the liquidation or estimation of contingent or unliquidated claims against the estate." 130 Cong. Rec. 13,062 (1984); see *id.* at 13,088 (Thurmond Amendment No. 3083). Another Senator disagreed, explaining that, so amended, §157(b)(2)(B) would be, in one sense, too limiting and, in another, too permissive:

> A large portion of claims against an estate are unliquidated claims; that is, claims that have not been reduced to judgment before the commencement of a bankruptcy case. There is no reason why, after years of determining and estimating such claims, the bankruptcy courts should be deprived of that jurisdiction.
> It seems to me that they should have the jurisdiction.
> If the bankruptcy courts are unable to determine matters as fundamental as liquidating claims, the bankruptcy system will be made far more expensive for creditors and debtors alike, and I am afraid that only the bar would do well.
> On the other hand, there is a legitimate concern about the estimation of unliquidated personal injury tort claims which are brought into bankruptcy court by the fact that the defendant enters bankruptcy. Unlike a trade creditor who elects to do business with a particular company, the personal injury tort claimant does not choose to be injured by a particular debtor. It just happen[s]. For that reason, the amendment which I am offering would permit the bankruptcy court to issue final orders estimating or liquidating all claims except for unliquidated personal injury tort claims. Those individuals with the misfortune to have personal injury tort claims against a bankrupt would have the right to have a final order entered by an article III district judge.

*Id.* at 13,076. He instead proposed an "amendment . . . somewhat in the middle", to "allow[] personal injury tort actions to be taken out of the bankruptcy court into the district court for final adjudication, but permit[] the bankruptcy court to make final decisions on most other matters pending before it." *Id.* at 13,077. Under this amendment, §157(b)(2)(B) would have defined "core proceedings" to include "allowance or disallowance of claims against the estate or exemptions from property of the estate, but not the liquidation or estimation of contingent or unliquidated personal injury tort claims against the estate". *Id.* at 13,109 (DeConcini Amendment No. 3087). A "section-by-section analysis" of this amendment, composed by the Senator's staff, reads in relevant part as follows:

> Section 157(b)(2)(B). This provision provides that core proceedings include allowance or disallowance of claims against the estate or exemptions from property of the estate, but does not include liquidation or estimation of contingent or unliquidated personal injury tort claims against the estate. Bankruptcy courts have traditionally liquidated or estimated contingent or unliquidated claims. When a claim is based on a contract, for example, of a party dealing with the debtor, the efficient means of estimating those claims is in the bankruptcy court system. There are good grounds, however, for requiring that any final

the "pre-petition litigation" of such claims does not "fall[] under the language of" §157(b)(2)(O), thus preserving a distinction between "core proceedings" and "non-core proceedings". See ECF No. 25, at 5.

The defendants explain, with respect to §157(b)(2)(O), that "courts . . . routinely hold that 'merely because the bankruptcy estate has the potential to recover funds as a result of [litigation] does not render the proceeding "core."'" *Id.* at 5 (alteration in original) (quoting *Cashco, Inc.*, 614 B.R. at 720) (citing *Scott*, 572 B.R. at 519). Whether such a rule is accurate, at least in some circumstances, is immaterial: notwithstanding the estate's potential to recover funds on a claim, under §157(b)(2)(O)'s plain text, a claim is a "core proceeding" if it is a "proceeding[] affecting the liquidation of the assets of the estate" that is not a "personal injury tort or wrongful death claim[]". Given *Stern*'s reasoning, this court is not persuaded that any other inquiry is necessary or appropriate.

Once again, the Charmolis are debtors in possession, who are therefore required to perform most of the duties of a trustee in their bankruptcy case, but they have "broad discretion to determine the best way to pursue the administration of the bankruptcy estate". See *Hoseman v. Weinschneider*, 322 F.3d 468, 475 (7th Cir. 2003); see also 11 U.S.C. §1107(a). They have chosen to liquidate assets of the estate and distribute the resulting money to the estate's creditors. They have opted to liquidate specific assets at least in

---

order estimating or liquidating personal injury tort claims, which are claims of parties who have not voluntarily involved themselves with the debtor, be entered by an Article III district court judge. For that reason, this provision exempts such claims from the definition of "core proceedings."

*Id.* at 13,077. Section 157(b)(2)(B) was later amended to define "core proceedings", much as it does today, to include both "estimation of claims or interest for the purposes of confirming a plan under chapter 11 or 13 of title 11" and "allowance or disallowance of claims against the estate or exemptions from property of the estate", but to expressly exclude "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11". §104(a), 98 Stat. at 340. Wrongful-death claims seem to have been included for the first time, without commentary, in a June 29, 1984 conference report. H.R. Rep. No. 98-882, at 9 (1984) (Conf. Rep.).

part by litigating certain pre-petition claims. As explained above, the resolution through litigation of Charmoli's removed claims is the means by which they intend to liquidate those claims, which are assets of the estate. And litigating the removed claims and counterclaims by and against Jackson Family Dentistry is the primary means by which they intend to liquidate the sole membership interest in that company, which is also an asset of the estate. Perhaps the estate's interest in Jackson Family Dentistry could be liquidated in some other way (e.g., by selling it). But, again, the company is dissolved, so applicable nonbankruptcy law requires that it be liquidated, and the liquidation of the estate's interest in it will necessarily follow. See *supra* note 30 (describing the applicable provisions of Wisconsin law). The defendants have not disputed that the means by which the Charmolis have chosen to liquidate these estate assets is within the scope of their discretion, as debtors in possession, nor have they challenged the exercise of that discretion with respect to these specific assets.[33]

---

[33] The defendants have not disputed that the means by which the Charmolis propose to liquidate the sole membership interest in Jackson Family Dentistry is within their "generally-recognized discretionary authority", as debtors in possession, "to take the actions that are necessary to accomplish" both the "maximization of realization on creditors' claims and [the] prompt and efficient administration of the estate." See *Hoseman*, 322 F.3d at 475 (quoting *Iannacone v. Foothill Cap. Corp. (In re Hancock-Nelson Mercantile Co., Inc.)*, 95 B.R. 982, 1003 (Bankr. D. Minn. 1989)). "Property of the estate does not include . . . any power that the debtor may exercise solely for the benefit of an entity other than the debtor . . . ." 11 U.S.C. §541(b)(1). Which is to say, Charmoli's membership interest (i.e., his financial stake) in Jackson Family Dentistry is property of the estate, but his power to manage and act for the company, as its only member, is not. And, as already noted, Jackson Family Dentistry's removed claims against the defendants are *not* property of the estate, so the Charmolis are not expressly authorized to prosecute them as debtors in possession. See Fed. R. Bankr. P. 6009 (authorizing a debtor in possession to "commence and prosecute any action or proceeding on behalf of the estate before any tribunal"). As a result, liquidating the membership interest in Jackson Family Dentistry by litigating the removed claims by and counterclaims against it is arguably only permissible with Charmoli's participation, or at least his consent, as the company's sole member. Charmoli, as Jackson Family Dentistry's sole member, is clearly participating in (and has consented to) the litigation of claims by and against the company in order to liquidate the estate's financial interest in the company. Moreover, whether to attempt to liquidate or simply abandon the estate's interest in the company is a decision within the Charmolis' discretion, as debtors in possession, at least in the first instance, that they must make based on whether, in their view, that "property . . . is burdensome . . . or . . . of inconsequential value and benefit to the estate", i.e., whether it appears to them that the liquidated value of the property will be sufficient to justify the cost, in time and

The defendants argue that *In re Exide Technologies*, 544 F.3d 196 (3d Cir. 2008), supports the conclusion that the removed claims and counterclaims by and against Jackson Family Dentistry are subject to mandatory abstention under §1334(c)(2). Specifically, they point to the court's conclusion, in that case, that where "a plaintiff sues multiple defendants", "one [of those defendants] files for bankruptcy", and the "plaintiff files a proof of claim against the debtor", it does not follow that the plaintiff's "claims against the remaining co-defendants . . . become 'core' proceedings". 544 F.3d at 217, quoted in ECF No. 25, at 7. The defendants assert, "The same result is warranted here." ECF No. 25, at 7.

But *Exide* is inapposite for two reasons. First, its holding depends in large part on the Third Circuit's pre-*Stern* rule that "a claim will be deemed core 'if (1) it invokes a substantive right provided by title 11 or (2) if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case.'" 544 F.3d at 206 (quoting *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999)). For the reasons already stated, such rules no longer control whether a claim is a "core proceeding". Indeed, as noted above, such rules have never strictly controlled in the Seventh Circuit. See *supra* note 23.

Second, *Exide* concerns "state law [claims] between non-debtor parties", but that is the extent of the similarities between that case and this proceeding. 544 F.3d at 198. The claims at issue in *Exide* arose from the sale of interests in a business by one company "and four of its foreign affiliates" to Exide Technologies and three of its "foreign subsidiaries". *Id.* at 198–99. After the sale closed, the sellers sued the buyers in

money, to liquidate it. See 11 U.S.C. §554(a). Any party in interest may request that the court make that determination for them and order them to abandon the estate's interest in Jackson Family Dentistry or any other property of the estate. *See id.* §554(b). But the defendants have not moved for abandonment of any estate assets, nor have they challenged the scope or use of the Charmolis' administrative authority over the estate, so no such issues are before the court. Any such dispute would be a "matter[] concerning the administration of the estate" and therefore a "core proceeding" under the plain text of §157(b)(2)(A). Indeed, §1334(e)(1) vests in the district court "exclusive jurisdiction . . . of property of the estate", so any dispute about abandonment of such property would necessarily have to be decided here.

state court, alleging appropriation of millions of dollars owed to them under the sales agreements. Exide filed a bankruptcy case, staying the litigation against it, and its foreign subsidiaries removed the claims against them to the bankruptcy court, asserting "that the claims were at minimum 'related to' Exide's bankruptcy case". *Id.* at 200. They argued that, by the parties' agreement, "Exide was the 'sole indemnitor' and, therefore, the exclusive remedy available to the [plaintiffs] was a direct claim against Exide, not the foreign subsidiaries." *Id.* at 201. Based on this argument, and because the plaintiffs filed proofs of claim in Exide's bankruptcy case, the bankruptcy court concluded that the claims against Exide's subsidiaries were "core proceedings". The district court affirmed. But the Third Circuit—which was not convinced that Exide was the "only proper party to the . . . claims" against its foreign subsidiaries—observed that "[n]one of the claims fall neatly into the list of core proceedings under . . . § 157(b)(2)." *Id.* at 206 & 211. Therein lies the difference: the claims in *Exide* were not "core proceedings" under the plain language of §157(b)(2); the removed claims and counterclaims against Jackson Family Dentistry are, because resolving them "affect[s] the liquidation of [an] asset[] of the estate". §157(b)(2)(O); see *Barnett*, 909 F.2d at 979 ("The starting point for determining whether an action is a core proceeding is 28 U.S.C. § 157(b)(2), which contains a nonexclusive list of matters that are considered 'core proceedings.'"); *supra* note 23. As such, they are not subject to mandatory abstention under §1334(c)(2).

B

Although §1334(c)(2) does not require the court to abstain from hearing any of the parties' removed claims and counterclaims, other sections of title 28 authorize the court to decline to hear any or all of them "in the interest of justice, or in the interest of comity with State courts or respect for State law", §1334(c)(1), or remand any or all of them to the state court "on any equitable ground", §1452(b). Even where a court *may* abstain from hearing a claim, though, "abstention is the exception rather than the rule", and "federal courts generally should exercise their jurisdiction if properly conferred".

*In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 6 F.3d 1184, 1189 (7th Cir. 1993) (first citing *Prop. & Cas. Ins. Ltd. v. Cent. Nat'l Ins. Co. of Omaha*, 936 F.2d 319, 320–21 (7th Cir. 1991); then citing *New Orleans Public Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989); and then citing *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)). Still, the defendants urge this court to exercise its discretion to abstain from hearing and remand to the state court all of the parties' removed claims and counterclaims.

Numerous factors are potentially relevant to a court in determining whether to abstain from hearing and remand one or more claims over which it has jurisdiction under §1334(b). Among these are "the effect [of abstention] or lack thereof on the efficient administration of the estate", "the difficulty or unsettled nature of the applicable law", "the existence of a right to a jury trial", and "the presence in the proceeding of nondebtor parties." *Id.* (quoting *Eastport Assocs. v. City of Los Angeles (In re Eastport Assocs.)*, 935 F.2d 1071, 1075–76 (9th Cir. 1991)) (explaining that these factors were developed in the context of §1334(c)(1) but applying them to a case under the Bankruptcy Act of 1898; see also *Baxter Healthcare Corp. v. Hemex Liquidation Tr.*, 132 B.R. 863, 867–69 (N.D. Ill. 1991) ("The analysis of a subsection (c)(1) abstention is almost identical to the analysis conducted for a remand [under §1452(b)].")). But the "relevance and importance" of each such factor naturally "var[ies] with the particular circumstances of each case, and no one factor is necessarily determinative", so "[c]ourts should apply the[m] . . . flexibly"—which is to say, not mechanically or numerically. *Chi., Milwaukee, St. Paul & Pac. R.R.*, 6 F.3d at 1189.

Considering all of these factors, to the extent applicable here, as well as the general concerns identified by the applicable statutes—equity, under §1452(b), and "justice", "comity with State courts", and "respect for State law", under §1334(c)(1)—abstention and remand are not warranted. Some of the relevant factors arguably weigh in favor of abstention and remand: all of the parties' removed claims and counterclaims arise under state law, so "state law issues [may] predominate over bankruptcy issues",

at least in a narrow sense;[34] "a related proceeding [was] commenced in state court"; there is no "jurisdictional basis" here "other than . . . § 1334"; this proceeding involves "non-debtor parties"; and the defendants may be entitled to a jury trial on at least some of the removed claims and counterclaims. *Id.* (quoting *Eastport Assocs.*, 935 F.2d at 1075–76).[35] But these circumstances weigh too slightly in favor of abstention and remand to

---

34. As discussed, both above and below, Major Dental Partners and Dr. Major filed proofs of claim in the bankruptcy case and seek, in a related adversary proceeding, a determination that Charmoli owes them debts that cannot be discharged, and essentially the same allegations made in their proofs of claim and adversary complaint serve as the basis for their removed counterclaims against the plaintiffs. See *supra* note 10. Consequently, it is not at all clear that, simply because the parties' removed claims and counterclaims arise under state law, state-law issues predominate over bankruptcy issues (e.g., claims allowance, dischargeability) such that this factor weighs in favor of, rather than against, abstention and remand. Even assuming it does, however, its weight is slight, at most, given the extent to which this proceeding implicates core bankruptcy matters, including the liquidation of estate assets.

35. In their motion, the defendants assert that they "ha[ve] a right to a jury trial", but they do not cite any authority for this assertion, nor do they explicate their position on that issue. ECF No. 9, at 6, 8 & 9. The court ordered the defendants to address this assertion in light of the asset purchase agreement's express waiver of any right to a jury trial with respect to any claims and counterclaims arising from it. ECF No. 12, at 4 (quoting ECF No. 1-1, at 170); see also ECF No. 1-1, at 220 (similarly waiving the right to a jury trial on any claims arising from the employment agreement); *id.* at 202 (similarly waiving the right to a jury trial on any claims against Dr. Major based on his guaranty of Major Dental Partner's obligations under the asset purchase agreement, promissory note, and security agreement). The defendants then argued, in their reply brief, that the plaintiffs demanded a jury trial in the state-court case and thereby waived their right to enforce against the defendants any contractual waivers of the right to a jury trial on claims arising from the underlying agreements. See ECF No. 18, at 13–15. This does not clarify the defendants' more general argument, however, which appears to be only that they are "pursuing claims for fraud" against the plaintiffs, "including fraudulent inducement claims", and are "entitled to a jury trial on claims that seek this type of relief in connection with the [asset purchase agreement]." *Id.* at 13. This argument suffers from a fundamental disconnect, namely that it identifies the broad legal basis for the defendants' counterclaims against the plaintiffs ("fraud") but not the relief they seek on those counterclaims (only "this type of relief", whatever that may be). See *id.* This is a significant omission, as the right to a jury trial in federal court, in a case removed from state court, depends in large part on whether the relief sought is legal or equitable in nature. See, e.g., *Granfinanciera*, 492 U.S. at 40–42. At any rate, whether the defendants are entitled to a jury trial on any or all of the removed claims and counterclaims is an open question, even putting aside for the moment whether they contractually waived their right to a jury trial and whether the plaintiffs waived their right to enforce any relevant contractual waivers against the defendants. Even assuming the defendants are entitled to a jury trial on *all* of the removed claims and counterclaims, for the reasons set forth below, that does not weigh heavily enough in favor of abstention and remand (either on its own or when combined with other considerations that arguably favor that course) to change the court's decision to do neither: the district court is entirely capable of conducting a jury trial, if the need arises. See §157(d) (permitting the district

overcome countervailing considerations that weigh in favor of keeping all of the removed claims and counterclaims in this court, especially considering that, again, "[a]bstention is . . . a narrow exception to the exercise of federal jurisdiction". *Id.* at 1194.

The Charmolis' bankruptcy case is akin to a large interpleader: faced with liability on scores of contested and unliquidated claims, in an amount that far exceeds the total value of their unexemptible assets, they commenced a case under chapter 11, subchapter V, of the Bankruptcy Code and filed a plan, proposing to liquidate those assets and equitably distribute the resulting funds, after paying costs incurred in the administration of the estate, to their creditors based on the amount each is owed, as determined by the court in the claims-allowance process or by the relevant parties, through mediation or otherwise.

The bankruptcy estate's assets—the Charmolis' assets when the case was filed, minus the exemptions they claim—consist of real property, vehicles, membership interests in various LLCs, unliquidated claims, and other financial assets listed in the schedules with a total estimated value of about $5,756,000. See Case No. 22-24358, ECF No. 1, at 57–71. More than one-quarter of that value ($1,600,000) is attributed to the sole membership interest in Jackson Family Dentistry and the plaintiffs' removed claims arising from Charmoli's employment agreement with Jackson Family Dental, the asset purchase and security agreements between Jackson Family Dentistry and Major Dental Partners, the promissory note from Major Dental Partners to Jackson Family Dentistry, and Dr. Major's guaranty of the obligations of Major Dental Partners under those agreements and the note. *Id.* at 64, 66 & 67; see *supra* note 29.

The claims against the Charmolis total about $28,610,000, assuming the proofs of claim filed by Major Dental Partners and Dr. Major—in the same amount, based on the

court to withdraw any bankruptcy case or proceeding in whole or in part for cause shown); see also §157(e) (permitting a bankruptcy judge to conduct a jury trial "if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties").

same allegations, and filed with the same itemization of damages—are for the same debt or debts. The claims of Major Dental Partners and Dr. Major against Charmoli are for nearly $12,000,000, swamping the estimated value of the estate's assets and positioning them to collect far more from the liquidation of those assets than any of the estate's other creditors (a group composed almost entirely of Charmoli's former patients, whose attorneys are working with the Charmolis' bankruptcy counsel to agree upon mediation procedures to potentially resolve their claims outside of court, see Case No. 22-24358, ECF No. 191). And, as noted above, the alleged grounds for these claims and the non-dischargeability proceeding that Major Dental Partners and Dr. Major brought against Charmoli are essentially the same allegations that serve as the basis for their removed counterclaims against the plaintiffs in this proceeding. See *supra* note 10 and accompanying text.

        In moving for abstention and remand in this proceeding, the defendants effectively ask to be excused from the claims-allowance process mandated by the Bankruptcy Code so that they can instead continue a case in state court to which only they, one of the two debtors in possession in the bankruptcy case, and a defunct and dissolved LLC wholly owned by the estate are parties. Permitting the defendants to absent themselves from the centralized process to which they would otherwise be bound, along with all other creditors, would leave everyone else with a stake in the bankruptcy case, namely the appointed trustee and the other creditors, unable to object to—i.e., dispute either the validity or the amount of—the largest claims, by far, that have been asserted against the Charmolis, those held by Major Dental Partners and Dr. Major. See 11 U.S.C. §1183(b)(1) (requiring a trustee in a case under chapter 11, subchapter V, of the Bankruptcy Code to perform certain tasks required of a trustee in a chapter 7 case, including "examin[ing] proofs of claims and object[ing] to the allowance of any claim that is improper", under 11 U.S.C. §704(a)(5)); *id.* §502(a) & (b) (providing that "[a] claim . . . is deemed allowed" if a proof of claim is filed under 11 U.S.C. §501

"unless a party in interest, including a creditor . . . , objects" and listing permissible grounds for disallowance of a claim).

The Charmolis' plan and other filings in the bankruptcy case contemplate the consensual resolution of as many disputes as possible about the validity or the amount of the claims against them, with an aim toward consensus as to the distribution of the proceeds from liquidating the estate's assets. Amicably resolving most, if not all, such disputes with and among the creditors, including Major Dental Partners and Dr. Major, is likely the best (and maybe the only) way for the Charmolis to get a plan confirmed that maximizes both distributions to creditors and equity in allocating those distributions among them. Permitting the defendants to continue litigating in state court would leave them with no apparent reason to participate in this case-wide effort, thereby undermining it, perhaps fatally so; substantially hindering the trustee in fulfilling his statutory mandate to "facilitate the development of a consensual plan of reorganization", 11 U.S.C. §1183(b)(7); and largely preventing this court from ensuring that the estate's administrative expenses, especially compensation to its employed attorneys and other professionals, do not rise to such a degree that the estate's distributions to creditors from the liquidation of its assets are unduly reduced.

For these reasons, the litigation of the parties' removed claims and counterclaims should proceed in a single forum, and that forum should be this court because resolving those claims and counterclaims will undoubtedly affect the liquidation of the assets of the bankruptcy estate and determine whether and to what extent Major Dental Partners and Dr. Major are entitled to share in the distribution of the resulting proceeds. In terms of the factors that courts have listed as relevant to a decision on a motion for abstention and remand with respect to claims in a proceeding, "the effect [of abstention and remand] . . . on the efficient administration of the estate", "the degree of relatedness . . . of the proceeding to the main bankruptcy case", and "the feasibility of severing state law claims from core bankruptcy matters" weigh against abstention and remand,

substantially outweighing the factors, noted above, that weigh in favor of such relief. *Chi., Milwaukee, St. Paul & Pac. R.R.*, 6 F.3d at 1189 (quoting *Eastport Assocs.*, 935 F.2d at 1075–76).

The defendants' arguments to the contrary are not persuasive and are addressed above, with two exceptions. They concede that the state law that applies to the removed claims and counterclaim "is not difficult or unsettled", but they assert that "this factor . . . favors abstention." ECF No. 18, at 11 (first citing *Laddusire v. Auto–Owners Ins. Co. (In re Laddusire)*, 494 B.R. 373, 382 (Bankr. W.D. Wis. 2013); and then citing *Joremi Enters., Inc. v. Hershkowitz (In re New 118th LLC)*, 396 B.R. 885, 895 (Bankr. S.D.N.Y. 2008)). It does not. "If a state law issue is not unsettled . . . then the bankruptcy court is qualified to resolve the issue, and there is no need to refer it to a state court." *Chi., Milwaukee, St. Paul & Pac. R.R.*, 6 F.3d at 1189 n.8 (first citing *In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 654 F.2d 1218, 1221–22 (7th Cir. 1981); then citing *Hicks v. Thomson (In re Chi. & N.W. Ry. Co.)*, 127 F.2d 1001, 1004 (7th Cir. 1942); and then citing *Scroggins v. Powell, Goldstein, Frazer & Murphy (In re Kaleidoscope, Inc.)*, 25 B.R. 729, 742 (N.D. Ga. 1982)).

The defendants also argue that "the Bankruptcy Court has nearly six times the caseload of the State Court", which "favors abstention." ECF No. 18, at 12. But many, perhaps most, bankruptcy cases proceed without much direct involvement by the bankruptcy court, which is likely not true (or not true to the same degree) of many cases pending before the state court. Thus, it may be that, despite having far more cases, this court is less burdened by its caseload than is the state court and thus better positioned to efficiently hear the parties' removed claims and counterclaims. In fact, in recent years, bankruptcy filings have waned substantially, resulting in this court's four bankruptcy judges enjoying a rare period of excess capacity. From October 2019 through March 2020, an average of 875 new cases were filed in the bankruptcy court each month. See *Bankruptcy Statistics: Calendar Year Comparison 2018, 2019, 2020*, Bankr. E.D. Wis. (July 27, 2023), https://www.wieb.uscourts.gov/bankruptcy-statistics

/?calendaryear=2020. In the six months that followed, from April 2020 through September 2020, an average of only 677 new cases were filed in the bankruptcy court each month. See *id*. And recent case filings have dropped even lower, to only about 60% of what they were in the months before April 2020. See *Bankruptcy Statistics: Calendar Year Comparison 2021, 2022, 2023*, Bankr. E.D. Wis. (July 27, 2023), https://www.wieb .uscourts.gov/bankruptcy-statistics/?calendaryear=2023 (On average, about 513 new cases were filed in the bankruptcy court each month from January 2023 through June 2023.). As a result, the relative caseloads of this court and the state court are not significant to the analysis.

III

The motions by Major Dental Partners and Dr. Major, in the Charmolis' bankruptcy case, to "abstain, in part, from hearing [their] pending adversary proceeding", in which they seek a determination that Charmoli owes them debts that are not dischargeable, until the parties' removed claims and counterclaims are resolved, and for relief from the stay under 11 U.S.C. §362(a), to permit them to continue litigating the removed claims and counterclaims in state court, are both denied. Case No. 22-24358, ECF No. 107. Many of their arguments in support of this limited abstention motion are non-sensical. For instance, they argue that this court should abstain from hearing their adversary proceeding because they are entitled "to a jury trial in the State Court Litigation." *Id.* at 10. This is all the more confusing because they also argue, in nearly the same breath, both that "[t]here is very little relatedness between" the bankruptcy case (not the adversary proceeding) and the parties' removed claims and counterclaims and that "[t]he pending State Court Litigation" is a sufficiently "related proceeding in state court" to warrant this court's temporary abstention from hearing their adversary proceeding. *Id.* Perhaps, if this court had opted to abstain from hearing the removed claims and counterclaims and remand them to the state court, then it would be reasonable to put off hearing the pending adversary

proceeding, in light of the likely overlap of factual issues about Charmoli's alleged fraud during the parties' negotiations for the sale of his dental practice. Because the removed claims and counterclaims will remain in this court, however, there is no good reason for this court to stay all pre-trial litigation of the pending §523 claims. At a minimum, discovery relating to those claims should proceed to the extent discovery relating to the nondischargeability claims based on allegations of fraud, 11 U.S.C. §523(a)(2), and intentional injury, 11 U.S.C. §523(a)(6), overlaps with discovery related to Major Dental Partners and Dr. Major's removed counterclaims against Charmoli, his bankruptcy estate, and Jackson Family Dentistry based on allegations of fraud in the negotiation of the sale of the dental practice.

The motion for relief from the §362(a) stay plainly depends on the defendants prevailing on their motion for abstention and remand as to the parties' removed claims and counterclaims in this proceeding. *Id.* at 11–14. As this court denies the latter motion, for the reasons discussed above, there is not cause to grant the former.

IV

IT IS THEREFORE ORDERED that the defendants' motion for abstention and remand in this proceeding and the motions by Major Dental Partners and Dr. Major, in the underlying bankruptcy case, for abstention with respect to their pending adversary proceeding under 11 U.S.C. §523 and relief from the 11 U.S.C. §362(a) stay are denied.

#####